In re Jennie CHENG NA–YUET a/k/a Jennie Pau a/k/a Hortensia Nolan, Petitioner,

v.

Willard J. HUESTON, Daniel J. Horgan, and Edwin Meese, Respondents.

No. 87–2236–Civ–WMH.

United States District Court, S.D. Florida, Miami Division.

March 28, 1990.

---

Fine, Jacobson, Schwartz, Nash, Block & England, for petitioner.

Dexter W. Lehtinen, U.S. Atty., Donna A. Bucella, Asst. U.S. Atty., for respondents.

## FINAL JUDGMENT DENYING PETITION FOR WRIT OF HABEAS CORPUS

HOEVELER, District Judge.

### I  Background

On July 28, 1987, Jennie Pau Cheng Na-Yuet, a/k/a Jennie Pau, a/k/a Hortensia Nolan (hereinafter "Petitioner"), was arrested in Miami at the request of the United Kingdom, and on behalf of the British Crown Colony of Hong Kong. An extradition hearing was held before a United States Magistrate on October 15, 1987, at which Petitioner was held extraditable to Hong Kong on charges of kidnapping. Petitioner then sought review of the Magistrate's Order by petition for habeas corpus.[1] On March 30, 1988, District Judge Alcee Hastings remanded the matter for hearing on the grounds that "newly discovered evidence cast substantial doubt on the sufficiency of the evidence presented at the extradition hearing to establish probable cause that Pau committed the offense."[2]

Pursuant to the order of remand, an evidentiary hearing was held before a United States Magistrate on July 11, 1988. After reviewing the new evidence, the Magistrate determined that the government of Hong Kong had presented ample evidence of probable cause, and that Petitioner had not presented evidence sufficient to negate or explain the showing of probable cause. Accordingly, in an Order dated July 26, 1988, the Magistrate reaffirmed the original Order of Extradition from which the parties were given 10 days to file written objections before Judge Hastings. On August 1, 1988, Petitioner filed her objections to the Magistrate's Extradition Order, and on May 31, 1989, the matter was transferred to United States District Judge William Hoeveler.

### II  Scope of Review

■ On Petition for writ of habeas corpus, the scope of this Court's review of the Magistrate's extradition order is strictly limited to a determination of "whether the magistrate had jurisdiction, whether the offence [sic] charged is within the [extradition] treaty and, by a somewhat liberal extension, whether there was any evidence warranting the finding that there was reasonable ground to believe the accused guilty." *Fernandez v. Phillips*, 268 U.S. 311, 312, 45 S.Ct. 541, 542, 69 L.Ed. 970 (1925). In conducting this review, findings of fact are reviewed under a "clearly erroneous" standard, *Quinn v. Robinson*, 783 F.2d 776, 791 (9th Cir.), *cert. denied*, 479 U.S. 882, 107 S.Ct. 271, 93 L.Ed.2d 247 (1986), and legal questions are reviewed de novo. *Kamrin v. United States*, 725 F.2d 1225, 1227 (9th Cir.), *cert. denied*, 469 U.S. 817, 105 S.Ct. 85, 83 L.Ed.2d 32 (1984).

Extradition to Hong Kong is governed by the Extradition Treaty between the United States and United Kingdom of Great Britain and Northern Ireland (hereinafter the "Treaty"), June 8, 1972, 28 U.S.T. 227, T.I.A.S. No. 8468, and by the Supplementary Treaty Concerning the Extradition Treaty Between the Government of the United States of America and the Government of the United Kingdom of Great Britain and Northern Ireland (hereinafter the "Supplementary Treaty"), ratified and entered into force December 23, 1986 (132 Cong.Rec.S. 9120 (daily ed. July 16, 1986)).

Petitioner does not contend that the offense charged is not within the Treaty. Rather, Petitioner presents three lines of argument in opposition to extradition. First, Petitioner maintains that failure to give precedence to a request by the government of Panama for her extradition is in violation of Article III of the Panama Extradition Treaty,[3] Article X of the United

---

**1.** Since the Magistrate's Order of Extradition is not a final order, review is available only through petition for writ of habeas corpus. *Collins v. Miller*, 252 U.S. 364, 369–370, 40 S.Ct. 347, 349, 64 L.Ed. 616 (1920).

**2.** Order of Judge Alcee L. Hastings, 690 F.Supp. 1008, dated April 18, 1988, p. 8.

**3.** The Treaty between the United States of America and the Republic of Panama, 34 Stat. 2851; Treaty Series 445, was entered into force on May 8, 1905.

States–United Kingdom Extradition Treaty, and the Due Process Clause of the United States Constitution. Second, Petitioner asserts that the Magistrate lacked jurisdiction to certify extradition. Finally, Petitioner claims that the Magistrate erroneously determined that the government of Hong Kong had successfully demonstrated probable cause.

### III  The Extradition Request
### By Panama

On October 23, 1987, the government of Panama submitted to the State Department a request for extradition of Petitioner on charges of armed robbery. Petitioner argues that the Department of State has a non-discretionary duty to proceed with the execution of Panama's request. In searching for the source of this "non-discretionary" duty to proceed with Panama's request, Petitioner first cites Article III of the U.S./Panama Treaty which provides in pertinent part that: "[t]he extradition of fugitives under the provisions of this treaty *shall* be carried out in the United States and in the Republic of Panama, respectively ..." (emphasis added).[4]  Petitioner then points to Article X of the U.S./U.K. Treaty governing extradition to Hong Kong which provides that:

> If the extradition of a person is requested concurrently by one of the Contracting Parties and by another State or States, either for the same offense or for different offenses, the requested Party shall make its decision in so far as its law allows, having regard to all the circumstances, including the provisions in this regard in any Agreements in force between the requested Party and the requesting States, the relative seriousness and place of commission of the offenses, the respective dates of the requests, the nationality of the person sought and the possibility of subsequent extradition to another State.

Petitioner claims that the word "shall" of Article III of the Panama/U.S. Treaty imposes upon the State Department a "clear, ministerial, and non-discretionary duty"[5] to

process Panama's request, and that Article X of the U.S./U.K. Treaty provides the standards which the State Department must follow in determining which of the competing extradition requests should be honored. Although there is no record before this Court that reflects the process with which the State Department pursued the Hong Kong request for extradition in preference to the request by Panama, Petitioner maintains that this Court must nevertheless sit in review of State Department's decision.

■  The law, however, is firmly settled to the contrary, for the ultimate decision to extradite is "within the exclusive prerogative of the Executive in the exercise of its powers to conduct foreign affairs." *Escobedo v. United States*, 623 F.2d 1098, 1105 (5th Cir.1980). As the Seventh Circuit explained in *In re Matter of Assarsson*, 670 F.2d 722, 725 (7th Cir.1982):

> Extradition is a multiphased process. It is initiated when a requesting nation asks the Secretary of State to extradite a fugitive. *If the Secretary chooses to honor the request*, he may initiate the necessary judicial extradition proceedings by requesting the Justice Department to file a verified extradition complaint in a court having personal jurisdiction over the fugitive. (emphasis added)

There is thus no "non-discretionary duty" on the part of the Government to process requests from foreign states which could form the basis of Petitioner's objection, or create an interest which implicates the Due Process guaranties of the Fifth Amendment.

■  Although the judiciary has the authority pursuant to 18 U.S.C. Sec. 3184 to conduct hearings and render decisions on the extradition of fugitives sought by foreign governments, the statute provides that such hearing may only proceed "upon complaint made under oath". 18 U.S.C. § 3184. Thus, just as the judiciary cannot compel a prosecutor to file a criminal complaint, the judiciary is powerless to order

---

**4.**  *Id.,* Art. III.

**5.**  Petitioner's Legal Brief in Opposition to Extradition, at 4.

the executive branch to file a complaint for a fugitive requested by a sovereign nation. It is only *after* the executive decides to file a complaint that the judiciary obtains jurisdiction over an extradition.

■ In this case, no complaint seeking an extradition warrant on the basis of the Panamanian request has been filed. It therefore follows that the Government's alleged refusal to "process" Panama's request for extradition can in no way constitute a violation of Article X of the U.S./U.K. Treaty, nor violate Petitioner's right to Due Process under the Fifth Amendment. The decision to process or not to process the Panamanian request remains fundamentally a decision of the executive branch which is clearly beyond the scope of review by this Court on petition for writ of habeas corpus.

## IV  *Hong Kong's Reversion to China in 1997*

On July 1, 1997, Hong Kong is scheduled to revert to the People's Republic of China pursuant to the Joint Declaration of the Government of Great Britain and Northern Ireland and the Government of the People's Republic of China on the Question of Hong Kong with Annexes, Beijing, December 19, 1984, ratified and entered into force May 27, 1985, T.S. No. 26 (1985), Cmnd. 9543 ("Joint Declaration").

Petitioner argues that the Petition for writ of habeas corpus must be granted on the grounds that the Magistrate lacked jurisdiction to certify extradition since the Reversion of the government of Hong Kong to the People's Republic of China in 1997 makes it impossible for Hong Kong to comply with various terms of the Treaty. First, Petitioner maintains that it would be in violation of Article XII of the Treaty which provides Petitioner with certain protections after serving her sentence. Second, Petitioner claims that her extradition would violate Article IV of the Treaty, which allows the United States to deny extradition where the offense for which extradition is sought is punishable by death under the law of the requesting country,

but is not so punishable under the law of the requested country.

### A.  *Article XII of the Treaty:  Other Offenses*

Article XII provides in pertinent part, that:

> (1) A person extradited shall not be detained or proceeded against in the territory of the requesting Party for an offense other than an extraditable offense established by the facts in respect of which his extradition has been granted, or on account of any matters, nor be extradited by the Party to a third state: (a) until after he has returned to the territory of the requested party; or (b) until the expiration of thirty days after he has been free to return to the territory of the requested Party.

Treaty, Article XII(1).

■ Petitioner presents two ways in which the Reversion would violate Article XII. First, if Petitioner were to remain incarcerated at the time of Reversion, then she argues that she will, in effect, have been extradited to a third state, in violation of Article XII. In examining this position, this Court finds guidance in the case of *Oen Yin–Choy v. Robinson*, 858 F.2d 1400 (9th Cir.1988) where the Ninth Circuit ruled that:

> Even if [Petitioner] does remain in prison in 1997, the reversion of Hong Kong to Chinese authority does not result in an extradition within the meaning of Article XII(1). The Supreme Court long ago defined "extradition" as the "surrender by one nation to another of an individual accused or convicted of an offense outside of its own territory, and within territorial jurisdiction of another, which, being competent to try and punish him, demands his surrender". *Terlinden v. Ames*, 184 U.S. 270, 289, 22 S.Ct. 484, 492, 46 L.Ed. 534 (1902). We adopted that definition in *Stevenson v. United States*, 381 F.2d 142, 144 (9th Cir.1967). Neither deportation nor surrender other than in response to a demand pursuant to Treaty constitutes extradition ... Therefore, even if [Petitioner] becomes

subject to Chinese authority pursuant to a reversion of sovereignty upon cessation and termination of the British lease of Hong Kong, he will not have been extradited to China. *Oen Yin–Choy* at 1403–1404.

■ Second, Petitioner argues that if she were to remain incarcerated in Hong Kong after the transition to Chinese control, then she could be prosecuted for additional crimes, extradited to a third state, or not allowed to return to the requested country, in violation of Article XII. Thus, Petitioner argues that because Hong Kong is not in a position to assure that the provisions of Article XII will be complied with, "the extradition request is fatally defective and must be denied." [6] Such a reading of the Treaty would, in effect, prohibit any extradition for which the penalty could involve incarceration beyond the date of Reversion on July 1, 1997. In rejecting this position, the Ninth Circuit ruled in *Oen Yin–Choy, supra,* that there was no support for such an interpretation of the Treaty, and that there "is no indication that the United Kingdom and the United States had any such intention when they expressly made the Supplementary Extradition Treaty applicable to Hong Kong on January 1, 1988, at a time when the impending reversion was fully understood." *Oen Yin–Choy* at 1404.

In *In the Matter of the Extradition of Tang Yee Chun and Chan Wai-king* 674 F.Supp. 1058, 1068–69 (S.D.N.Y.1987), a District Court for the Southern District of New York faced with the same issue presented by two suspects subject to a request for extradition by Hong Kong on charges of bank fraud, ruled that it was beyond the scope of the court to inquire into what may happen after Hong Kong's change of sovereignty in 1997, and concluded that Petitioners' arguments were simply "too speculative and too remote to justify any action by this Court." *Id.* at 1068.

In short, Petitioner would interpret the Extradition Treaty to prohibit her extradition to the Treaty partner based on the possibility that the Treaty would be breached at a later date. In accord with the courts which have examined this issue, this Court finds that such speculation regarding a potential breach in the Treaty is too remote and tenuous a ground upon which effectively to abrogate an existing Treaty between the United States and the United Kingdom.

### B. *Article IV of the Treaty: Capital Punishment*

■ Petitioner argues that Article IV of the Extradition Treaty prohibits extradition in this case. Article IV provides that:

If the offense for which extradition is requested is punishable by death under the relevant law of the requesting Party but the relevant law of the requested Party does not provide for the death penalty in a similar case, extradition may be refused unless the requesting Party gives assurances satisfactory to the requested Party that the death penalty will not be carried out.

Under Florida law, the crime of kidnapping is punishable by a term of years not to exceed life. Fla.Stat. § 787.01(2). Federal law, likewise, provides that kidnapping is punishable by a term of years or for life. 18 U.S.C. § 1201. Hong Kong law also provides that the maximum punishment is imprisonment for life. Section 42 Offenses Against the Person Ordinance, Chapter 212 Laws of Hong Kong. Petitioner, however, maintains that the laws of the People's Republic of China provides that the crime of kidnapping is punishable by death.[7]

Petitioner argues that, if convicted, she would most probably still be imprisoned at the time of reversion in 1997, and that there is "no guarantee" that "China will

---

6. Petitioner's Legal Brief in Opposition to Extradition, at 21.

7. In support of this assertion, Petitioner cites *The Decision of the Standing Committee of the National People's Congress Regarding the Severe Punishment of Criminal Elements Who Seriously*

*Endanger Public Security,* which, according to Petitioner supplements the Chinese Criminal Code. For the purposes of this decision, the Court accepts Petitioner's contention that kidnapping may be punishable by death in China.

not decide to impose its laws with regard to kidnapping retroactively." [8] Petitioner thus maintains that the possibility of retroactive capital sentencing by the People's Republic of China "bars the court from granting Hong Kong's extradition request." [9]

At the onset, it should be noted that the Joint Declaration governing the Reversion provides that Hong Kong will enjoy a high degree of post–1997 autonomy, that its legal system will be kept intact, and that the laws currently in force in Hong Kong will remain basically unchanged. Articles 3(2) and 3(3) of the Joint Declaration. Thus, Petitioner could face the danger of capital punishment only if she were convicted, if she were to remain incarcerated in 1997, and if the People's Republic of China were to violate the provisions of the Joint Declaration by deciding to subject Petitioner to capital punishment years after her conviction by a Hong Kong court. Even assuming that this Court were persuaded that Petitioner was in grave danger of receiving the death penalty, Article IV can in no way operate to "bar" the court from upholding the granting of the request for extradition. Rather, Article IV *allows* the "requested Party" (the United States) to refuse extradition unless the "requesting Party" (Hong Kong) fails to give *satisfactory* assurances that the death penalty will not be carried out. Thus, Article IV provides a discretionary basis for denial of extradition by the government of the United States.

Attempting to weigh the possibilities of Petitioner being tried again or receiving capital punishment after the Reversion of 1997 is a daunting task. The Court is not as convinced as the government that "Petitioner's claim that there exists a possibility that she will receive the death penalty for her crime in Hong Kong sometime after 1997 pushes the notion of what is 'possible' to the limits." [10] Rather, this Court is moved by Petitioner's fears of capital punishment by the People's Republic of China.

Nevertheless, on Petition for Writ of Habeas Corpus, the Court is not cast in the role of deciding whether or not extradition is the best of all possible solutions. As observed by Judge Wisdom:

> Review by habeas corpus tests only the legality of the extradition proceedings; the question of the wisdom of the extradition remains for the executive branch to decide.

*Wacker v. Bisson,* 348 F.2d 602, 606 (5th Cir.1965). Petitioner's argument that her extradition places her in danger of being executed is most properly before the Secretary of State who would, if convinced, exercise the discretionary authority either to deny extradition altogether, or to attach the appropriate conditions to surrender. As commented by the Sixth Circuit:

> The ultimate decision to extradite is a matter within the exclusive prerogative of the Executive in the exercise of its powers to conduct foreign affairs. (citation omitted). A decision to attach conditions to an order of extradition is within the discretion of the Secretary of State, not the courts.

*Demjanjuk v. Petrovsky,* 776 F.2d 571, 584 (6th Cir.1985). Finally, Petitioner's arguments under Article IV conflict with settled principles of international comity, for "[i]t is not the business of our courts to assume the responsibility for supervising the integrity of another sovereign nation. Such an assumption would directly conflict with the principle of comity upon which extradition is based." *Jhirad v. Ferrandina,* 536 F.2d 478, 485 (2d Cir.1976) (citing *Factor v. Laubenheimer,* 290 U.S. 276, 54 S.Ct. 191, 78 L.Ed. 315 (1933)).

## V   *Probable Cause*

Petitioner further argues that her Petition for writ of habeas corpus should be granted on the grounds that, the United States Magistrate erroneously concluded that the government of Hong Kong had

---

**8.** Petitioner's Brief in Opposition to Extradition at 24.

**9.** *Id.*

**10.** United States Reply Memorandum to Petitioner's Legal Brief, Probable Cause Analysis, and Factual Submissions at 18.

shown the probable cause prerequisite to extradition under the Treaty.

### A. Standard of Review

An extradition hearing is not a trial on the merits and does not require proof sufficient to satisfy the factfinder in a criminal trial. The standard provided for by the Treaty is whether the evidence is sufficient to justify committal for trial according to United States law. Treaty, Article IX; *see also* 18 U.S.C. § 3184. The Treaty thus requires a finding of probable cause, defining the standard as requiring "sufficient evidence to warrant a [person] of reasonable belief that; (1) the person arrested or summoned to appear is the person sought; [and] (2) an offense has been committed by the accused. Treaty, Article IX.

In articulating a standard by which to measure opposition to a requesting country's proffer of probable cause, the Courts have developed the principle that evidence which tends merely to contradict the requesting country's case is inadmissible, but that the extraditee can present evidence tending to explain or clarify the proof. As to the elusive distinction between "contradictory" and "explanatory" evidence, the court in *In re Sindona*, 450 F.Supp. 672, 685 (S.D.N.Y.1978) commented that:

> [t]he distinction between "contradictory evidence" and "explanatory evidence" is difficult to articulate. However, the purpose behind the rule is reasonably clear. In admitting "explanatory evidence", the intention is to afford an accused person the opportunity to present reasonably clear-cut proof which would be of limited scope and have some reasonable chance of negating a showing of probable cause.

In *Shapiro v. Ferrandina*, 355 F.Supp. 563, 572 (S.D.N.Y.1973), *affirmed*, 478 F.2d 894 (2d Cir.1973) the court stated that:

> [w]hat tends to obliterate probable cause may be considered but not what merely contradicts it. The improbability or the vagueness of the testimony may destroy the probability of guilt, but the tendering of witnesses who testify to an opposite version of the facts does not. The latter must await a trial on the merits.

■ Thus, the extraditee cannot avoid extradition simply by contradicting the requesting country's case. Rather, the extraditee must "negate" or "obliterate" the requesting country's showing of probable cause. Furthermore, on a petition for writ of habeas corpus, the scope of review of the Magistrate's determination of probable cause is limited to "whether there was *any evidence* warranting the finding that there was reasonable ground to believe the accused guilty." *Quinn v. Robinson*, 783 F.2d 776, 790 (9th Cir.1986) (citing *Fernandez v. Phillips*, 268 U.S. 311, 312, 45 S.Ct. 541, 542, 69 L.Ed. 970 (1925) (emphasis added).

### B. The Grounds for Probable Cause

■ Petitioner is charged with the kidnapping of Wong Tak–Fai on April 12, 1983. The victim's wife was advised that her husband would be released for a ransom of 11 million dollars. The money was paid by telegram transfer to a bank account in Taipei, and on April 20, 1983, Won Tak–Fai was released. Chan Kam–Chuen, one of Petitioner's alleged conspirators, has been apprehended and has identified Petitioner by photograph as the "mastermind" of the operation. Through affidavit, Chan Kam–Chuen describes in detail Petitioner's role in the kidnapping, and her coordination of the laundering of the ransom money.

As further basis for probable cause, investigations by the Hong Kong authorities show that Petitioner left Hong Kong immediately after the kidnapping. The affidavit of Inspector Ng Kam–Wing of the Royal Hong Kong Police, the officer in charge of the investigation of Petitioner, explains that after receiving the ransom money, Petitioner had directed a friend in Taiwan, Ms. Chan Shin–Chen, to open a bank account at the East Branch of the First Commercial Bank into which Petitioner transferred the 11 million dollars ransom money.

#### 1. The Government's Key Witness: Chan Kam Chuen

Petitioner attacks Hong Kong's presentation of probable cause as resting solely on the inherently unreliable testimony of Chan Kam Chuen, who was the only wit-

ness to identify Petitioner as being at the scene of the kidnapping, the only witness to call Petitioner the mastermind of the operation, and the only witness who claims that Petitioner directed the disbursement of the ransom money.

Petitioner argues that Chan Kam Chuen's testimony is so unreliable as to "obliterate" the showing of probable cause. As grounds for her attack on Chan Kam Chuen's reliability, Petitioner points out that his testimony was obtained after he had turned himself in and confessed to the Hong Kong authorities, but before he was sentenced for his role in the crime. Furthermore, Petitioner maintains that various details of Chan Kam Chuen's account of what happened are contradicted by the affidavit of another witness in the case, Lo Yau Chuen. Specifically, Chan Kam Chuen recounts that Petitioner was not at the scene of the kidnapping. By contrast, Lo Yau Chuen states that there was a woman at the scene of the kidnapping who was in the "old white Mercedes Benz" used to block the victim's car from behind. These discrepancies, however, are minor, and do not wholly discredit either witness.

In order to "negate" Hong Kong's showing of probable cause, Petitioner must discredit the testimony relied upon by Hong Kong to the extent that this Court can find that there is not "any evidence warranting the finding that there was reasonable ground to believe the accused guilty." *See Quinn v. Robinson, supra* 783 F.2d at 790. Although some doubt as to the credibility of Chan Kam Chuen's version of what actually transpired is cast by the fact that his testimony was provided while he was in prison awaiting sentencing for the very crime in which he was implicating Petitioner, the appropriate acid test for his testimony must take place at a trial on the merits, not on motion for writ of habeas corpus.

### 2. Petitioner's Version of the Facts

Petitioner explains that she was not involved in the kidnapping; that she was simply assisting in the transfer of money outside of Hong Kong. She further explains her travels between Taiwan, Hong Kong, and the United States, as preparatory steps in the establishment of a second travel agency business in California; a business venture she had been planning since 1980. Petitioner had even applied for and received a Tax Identification number from the IRS, and a nonimmigrant visa for the United States, and suggests that if she were planning a kidnapping, she would not plan to flee to a country such as the United States which has an extradition Treaty with Hong Kong. Petitioner concludes that these seemingly legitimate business actions make Hong Kong's version of the events "highly improbable".[11] Although Petitioner has presented a set of facts which could be consistent with her innocence, such presentation clearly fails to "negate" the Hong Kong Government's showing of probable cause.

### 3. Madame Chan

Petitioner argues that the testimony of Madame Chan, who was a major conspirator in the kidnapping according to Chan Kam Chuen, highlights another weak link in the chain of Hong Kong's evidence in support of probable cause. Madame Chan was first interviewed in May of 1988, (over 5 years after the crime), by the Hong Kong authorities. During the interview, Madame Chan stated under oath that Petitioner told her that the money she helped Petitioner transfer out of Hong Kong was money belonging to high government officials who wanted to transfer their wealth out of Hong Kong before the reversion in 1997. Petitioner maintains that this testimony "corroborates" Petitioner's version of the facts: that Petitioner herself was not involved in kidnapping, but was only involved with money transferring. However, Madame Chan's ignorance of the kidnapping scheme is not inconsistent with Hong Kong's accusation that Petitioner masterminded the kidnapping, for if indeed Petitioner were the mastermind, she likely would have had no reason for disclosing to Madame Chan the source of the 11 million dollars.

---

**11.** Petitioner's Revised Probable Cause Analysis    at 15.

## C. Conclusion Regarding Probable Cause

Petitioner has presented a case which arguably creates reasonable doubt as to her guilt. But this proceeding is not the forum where reasonable doubt must be weighed and ascertained. On Petition for writ of habeas corpus, this Court must only inquire as to whether there exists "any evidence of probable cause". See, Quinn v. Robinson, supra 783 F.2d at 790. Despite the claimed defects present in the affidavit of Chan Kam Chuen, the government of Hong Kong has presented sufficient evidence to warrant a finding of probable cause.

### VI Conclusion

In sum, this Court finds that the Government's failure to honor the Panamanian request for extradition is not in violation of the U.S./Panama Treaty, the U.S./U.K. Treaty, or the Due Process Clause of the Fifth Amendment. Furthermore, Petitioner's extradition to Hong Kong would not be in violation of either Article IV or Article XII of the Extradition Treaty Between the United Kingdom and the United States. Consequently, the Magistrate did not lack jurisdiction to certify extradition. Finally, this Court finds that the Government of Hong Kong has shown probable cause sufficient to warrant extradition. There being thus no grounds upon which to grant the Petition for Writ of Habeas Corpus, it is hereby

ORDERED AND ADJUDGED that the Petition for Writ of Habeas Corpus be DENIED and that final judgment be granted in favor of Respondent and against Petitioner. This case is accordingly dismissed.

It is further ORDERED that Petitioner's extradition be stayed only for the period during which Petitioner may take an appeal from this Order.

DONE AND ORDERED.