**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Ramon PUENTES, Defendant–Appellant.**

No. 93–4073.

United States Court of Appeals,
Eleventh Circuit.

May 2, 1995.

Donald L. Ferguson, Boca Raton, FL, Jack M. Denaro, Miami, FL, for appellant.

Christopher Clark, Marc Fagelson, Linda Collins Herzt, U.S. Attys., Miami, FL, for appellee.

Before KRAVITCH and HATCHETT, Circuit Judges, and CLARK, Senior Circuit Judge.

HATCHETT, Circuit Judge:

In this criminal appeal, we affirm the conviction and sentence, holding that a criminal defendant has standing to allege a violation of the principle of specialty, limited, however, to those objections that the rendering country might have brought.

## FACTS

In September, 1989, a federal grand jury in the Southern District of Florida returned an indictment charging appellant, Ramon Puentes, in four of its thirteen counts. Count IV, the only count relevant to this appeal, charged Puentes with conspiracy to import cocaine in violation of 21 U.S.C. § 952(a), and listed a conspiratorial period from 1982 to November 29, 1988.

Law enforcement officers arrested Puentes in Uruguay in February, 1991, and the United States requested his extradition. In support of the extradition request, the Department of State provided Uruguay with two affidavits. The affidavits set forth a statement of the facts of the case, described the charged offenses, the applicable punishment and legal proceedings, and identified Puentes.

The Uruguayan Court of Appeals granted the extradition request only with respect to

Count IV. Upon return to the United States, Puentes made his initial appearance before a magistrate judge on September 30, 1991. In December 1991, the grand jury returned a superseding indictment charging additional defendants with drug and money laundering offenses. The conspiratorial period of Count IV was also changed from November 29, 1988, to December 13, 1991, thereby expanding for three years the conspiratorial offense for which Puentes had been extradited. A jury found Puentes guilty as to Count IV of the superseding indictment.

At trial, the government presented evidence of Puentes's involvement in several large-scale drug trafficking operations.

*Autoworld load:* In 1984, law enforcement officials conducted surveillance of Autoworld, a Miami, Florida automobile dealership Puentes owned. An undercover agent posing as a drug smuggler picked up a Winnebago motor home at Autoworld and transported the motor home to a warehouse in Miami. Coconspirators loaded the Winnebago with 664 kilograms of cocaine that had previously been smuggled into the United States. Agents then observed a driver enter the Winnebago. Prior to reaching its destination, law enforcement officers arrested the driver.

*Bahamas load:* During the summer of 1984, Puentes employed Jose Yero to transport 400 kilograms of cocaine from the Bahamas to Florida. Yero specialized in providing transportation services to the owners of cocaine shipments. Yero met Puentes and another coconspirator at Autoworld where they discussed arrangements for transporting the cocaine. Following the successful smuggling of the cocaine into the United States, Yero arrived at Autoworld and was paid $500,000 and selected a Lamborghini from the dealership. Puentes also paid Yero for his assistance in finding customers for 100 kilograms of cocaine that Puentes wanted to sell.

*Orient Star load:* In May, 1985, Puentes and other coconspirators, including Indelacio Iglesias, imported 1,800 kilograms of cocaine into the United States aboard the vessel "The Orient Star." The vessel traveled from the Canary Islands to Panama, where coconspirators loaded it with cocaine, and then it sailed on to California. After distributing some of the cocaine, Iglesias and Puentes loaded the remaining cocaine into a Winnebago motor home and drove it to Miami.

*Puerto Rican loads:* During 1988 and 1989 Puentes arranged to import cocaine through Puerto Rico into the United States. During this period, Puentes and his coconspirators imported four loads of cocaine into the United States: 380 kilograms in May 1988; 700 kilograms in September of 1988; and, two 700 kilogram loads that were airdropped in May 1989.

*Good Luck load:* In November, 1990, Spanish police seized 535 kilograms of cocaine aboard the vessel "Good Luck" that was destined for Spain. Conversations the Spanish police intercepted showed that Puentes was one of the organizers and investors in the Good Luck smuggling operation and that Iglesias was the intended recipient. The Spanish Government arrested Iglesias and contacted Uruguayan police to arrest Puentes.

At trial, the government presented the testimony of several of Puentes's coconspirators who were cooperating with the government, including Gabriel Taboada and Jose Yero, both of whom testified concerning the Autoworld smuggling episodes. Nine cooperating witnesses testified concerning the Orient Star endeavor. Seven other cooperating witnesses also testified concerning Puentes's other efforts to smuggle cocaine into the United States.

## PROCEDURAL HISTORY

The original indictment was handed down on September 29, 1989. Law enforcement officers arrested Puentes in Punta del Este, Uruguay on February 17, 1991, and Uruguay ordered his extradition only as to Count IV, on September 30, 1991. The grand jury returned the superseding indictment on December 13, 1991. Puentes's trial on Count IV of the superseding indictment commenced on May 11, 1992; and on May 21, 1992 the jury returned a guilty verdict.

Puentes filed a post-conviction motion for arrest of judgment, pursuant to Federal Rules of Criminal Procedure 34, asserting a violation of the specialty doctrine and a motion to enjoin his sentence also based upon the specialty doctrine. He also filed a motion requesting a new trial on the grounds of newly discovered evidence. The district court conducted a hearing on December 22, 1992, rejected the specialty doctrine claim, and orally denied Puentes's motions for arrest of judgment and enjoinder of sentence. The district court denied Puentes's new trial motion at his sentencing hearing on January 13, 1993. The district court found that even if the proffered evidence in support of a new trial was completely credible, it would not result in a different verdict. The court then sentenced Puentes to 365 months imprisonment.

## ISSUES

Puentes raises the following issues: (1) whether his prosecution under Count IV of the superseding indictment was for a different offense than the offense for which he was extradited; (2) whether his sentence should have been computed under the Sentencing Guidelines; (3) whether the district court improperly admitted evidence that was not properly authenticated; (4) whether he was entitled to a mistrial on the grounds that the jury heard hearsay testimony that a coconspirator had implicated Puentes in his post arrest statements; (5) whether the district court allowed the government to present irrelevant evidence of Puentes's participation in a conspiracy to import drugs into a foreign country; (6) whether the district court incorrectly made certain evidentiary ruling whose cumulative effect warrants a new trial; (7) whether the government impermissibly exercised peremptory challenges solely on the basis of race; and, (8) whether the district court erred in denying his motion for a new trial based on newly discovered evidence.

## DISCUSSION

### 1. Extradition

Puentes contends that because the superseding indictment extended Count IV's period of the conspiracy for three years, it was a different offense than the offense for which he was extradited. Therefore, he asserts, his prosecution violated the extradition treaty between the United States and Uruguay, which mandates that an extradited person be tried only for the offense for which extradition is granted. Puentes argues that the Uruguayan extradition warrant both limited his prosecution for conspiracy to import cocaine to the Orient Star episode, and designated November 29, 1988, as the termination date of the conspiracy. He argues that because the affidavits in support of his extradition only referred to the Orient Star episode, his prosecution should have been limited to that one instance of illegality.

The government asserts that in this circuit it is an open question whether Puentes has standing to claim a breach of the extradition treaty. Alternatively, the government challenges the merits of Puentes's claim and contends that the superseding indictment did not materially or substantially alter the original charge. Puentes, therefore, was not convicted of a different crime than the one specified in the extradition treaty.[1]

### A. Standing

The government correctly points out that this circuit has not squarely addressed the issue of whether a defendant has standing to assert a violation of an extradition treaty. When faced with appellants' challenges to extradition, this court has assumed, without deciding, that the appellants had standing to bring the claim. *See, e.g., United States v. Herbage,* 850 F.2d 1463, 1466 (11th Cir.1988), *cert. denied,* 489 U.S. 1027, 109 S.Ct. 1158, 103 L.Ed.2d 217 (1989); *United States v. Lehder–Rivas,* 955 F.2d 1510, 1520 n. 7 (11th Cir.), *cert. denied, Reed v. United States,* —— U.S. ——, 113 S.Ct. 347, 121 L.Ed.2d 262 (1992).

1. The government argues that Puentes waived his specialty claim when he failed to raise it in a pretrial motion. Puentes argues that he properly raised the specialty claim in his enjoinder of sentence and arrest of judgment motions. Because we conclude that Puentes cannot prevail on the merits of his specialty claim, we choose not to resolve the waiver issue.

■ Under the doctrine of specialty, a nation that receives a criminal defendant pursuant to an extradition treaty may try the defendant only for those offenses for which the other nation granted extradition. *Herbage*, 850 F.2d at 1465; M. Bassiouni, *International Extradition: United States Law and Practice*, vol. 1, ch. 7, p. 359–60 (2d rev. ed. 1987). The question of whether a criminal defendant has standing to assert a violation of the doctrine of specialty has split the federal circuit courts of appeals.[2] This case squarely presents us with the question, and we therefore decide it. We hold that a criminal defendant has standing to allege a violation of the principle of specialty. We limit, however, the defendant's challenges under the principle of specialty to only those objections that the rendering country might have brought.

■ Extradition is "the surrender by one nation to another of an individual accused or convicted of an offense outside of its own territory, and within the territorial jurisdiction of the other, which, being competent to try and to punish him, demands the surrender." *Terlinden v. Ames*, 184 U.S. 270, 289, 22 S.Ct. 484, 492, 46 L.Ed. 534 (1902). As a matter of international law, however, nations are under no legal obligation to surrender a fugitive from justice in the absence of a treaty. Bassiouni, at 319; *Factor v. Laubenheimer*, 290 U.S. 276, 287, 54 S.Ct. 191, 193, 78 L.Ed. 315 (1933). An extradition treaty is, therefore, a cooperative agreement between two governments for the prosecution and punishment of criminal offenders. *See* Bassiouni at 319. Extradition treaties

typically specify certain offenses for which extradition will be granted as between the two respective nations. Upon receipt of an extradition request, the surrendering nation may examine the substance of each of the charges specified in the request, and may choose to grant extradition for only the extraditable offenses listed in the treaty. The doctrine of specialty, therefore, provides the surrendering nation with a means of ensuring compliance with this aspect of the extradition treaty, and "reflects a fundamental concern of governments that persons who are surrendered should not be subject to indiscriminate prosecution by the receiving government. . . ." *Fiocconi v. Attorney General of United States*, 462 F.2d 475, 481 (2d Cir.), *cert. denied*, 409 U.S. 1059, 93 S.Ct. 552, 34 L.Ed.2d 511 (1972). Consequently, the principle is an implicit limitation on the requesting nation's ability to prosecute the defendant.[3]

The Supreme Court first recognized the doctrine of specialty in *United States v. Rauscher*, 119 U.S. 407, 7 S.Ct. 234, 30 L.Ed. 425 (1886). Great Britain surrendered William Rauscher, the second mate on an American ship, to the United States on a charge of murder. The United States, however, tried and convicted him of a charge of infliction of cruel and unusual punishment. The extradition treaty listed murder as an extraditable offense, but did not contain the crime for which the court convicted Rauscher. *Rauscher*, 119 U.S. at 411, 7 S.Ct. at 236. Great Britain, moreover, had not specifically objected to Rauscher's trial on the cruel and

**2.** *Compare United States v. Kaufman*, 874 F.2d 242, 243 (5th Cir.1989) (per curiam) (denial of petition for rehearing and suggestion for rehearing en banc) (stating that only the offended nation that is a party to a treaty may complain of a breach of the treaty) *and Demjanjuk v. Petrovsky*, 776 F.2d 571, 583–84 (6th Cir.1985) (expressing doubt that the individual has standing on the grounds that "[t]he right to insist on application of the principle of specialty belongs to the requested state, not to the individual whose extradition is requested") (citation omitted), *cert. denied*, 475 U.S. 1016, 106 S.Ct. 1198, 89 L.Ed.2d 312 (1986) *with United States v. Levy*, 905 F.2d 326, 328 n. 1 (10th Cir.1990) (extradited individual has standing to claim a violation of the rule of specialty), *cert. denied*, 498 U.S. 1049, 111 S.Ct. 759, 112 L.Ed.2d 778 (1991) *and United*

*States v. Thirion*, 813 F.2d 146, 151 n. 5 (8th Cir.1987) (allowing the extradited individual to bring any objections the rendering country might have raised) *and United States v. Najohn*, 785 F.2d 1420, 1422 (9th Cir.) (same), *cert. denied*, 479 U.S. 1009, 107 S.Ct. 652, 93 L.Ed.2d 707 (1986).

**3.** The surrendering nation may be particularly concerned that the individual be tried for only common crimes as opposed to political crimes. By confining the terms of the individual's extradition to certain specified offenses, the principle of specialty furthers this goal of the surrendering nation. *See* Note, *International Extradition, The Principle of Specialty, and Effective Treaty Enforcement*, 76 Minn.L.Rev. 1017, 1025 (1992).

unusual punishment charge. The Court, however, inferred that Great Britain would object to Rauscher's prosecution on the charge of infliction of cruel and unusual punishment based on that country's previous refusal to surrender a fugitive within its borders in the absence of a pledge from the United States that it would not try him for any other offense than that for which it had demanded him. *Rauscher*, 119 U.S. at 415, 7 S.Ct. at 238. The Court held that because Rauscher had been brought within the jurisdiction of the court under an extradition treaty, he could only be tried for one of the offenses described in the treaty and for the offense with which he had been charged in the extradition proceeding. *Rauscher*, 119 U.S. at 430, 7 S.Ct. at 246.

In *Rauscher*, the Court drew a distinction between this country's treatment of a treaty and other countries in which a treaty is essentially a contract between two nations. Under our Constitution, the Court explained, a treaty is the law of the land and the equivalent of an act of the legislature. *Rauscher*, 119 U.S. at 418, 7 S.Ct. at 239–40. The Court's opinion suggests that the rights described in the treaty are conferred on both the extradited individual and the respective governments. The Court stated:

> *[A] treaty may also contain provisions which confer certain rights upon the citizens* or subjects of one of the nations residing in the territorial limits of the other, which partake of the nature of municipal law, and *which are capable of enforcement as between private parties in the courts of the country....* The Constitution of the United States places such provisions as these in the same category as other laws of Congress, by its declaration that "This Constitution and the laws made in pursuance thereof, and all treaties made or which shall be made under authority of the United States, shall be the supreme law of the land." A treaty, then, is a law of the land, as an Act of Congress is, whenever its provisions prescribe a rule by which *the rights of the private citizen or subject may be determined.* And when such rights are of a nature to be enforced in a court of justice, that court resorts to

the treaty for a rule of decision for the case before it as it would to a statute. *Rauscher*, 119 U.S. at 418–19, 7 S.Ct. at 240 (quoting *Chew Heong v. United States*, 112 U.S. 536, 540, 565, 5 S.Ct. 255, 256, 269–70, 28 L.Ed. 770 (1884)) (emphasis added). Moreover, the Court asserted that it was "impossible to conceive" of an exercise of jurisdiction which could ignore the principle of specialty and not implicate a *"fraud upon the rights of the party extradited and of bad faith to the country which permitted his extradition."* *Rauscher*, 119 U.S. at 422, 7 S.Ct. at 242 (emphasis added). Finally, the Court concluded that the rule of specialty is "conclusive upon the judiciary of the right conferred upon persons brought from a foreign country into this [country] under such proceedings." *Rauscher*, 119 U.S. at 424, 7 S.Ct. at 243.

We find support for our holding in *Ker v. Illinois*, 119 U.S. 436, 7 S.Ct. 225, 30 L.Ed. 421 (1886), a companion case to *Rauscher*. Law enforcement officers kidnapped Ker in Peru and forcibly brought him to the United States to face a state court charge of larceny. He argued that his kidnapping violated the provisions of the United States–Peru extradition treaty. The Court rejected Ker's claim on the grounds that the extradition treaty was inapplicable because Ker had been abducted rather than extradited. 119 U.S. at 442, 7 S.Ct. at 228–29. The Court distinguished *Rauscher* on the grounds that Rauscher "came to this country clothed with a protection which the nature of such [extradition] proceedings and a true construction of the treaty gave him." *Ker*, 119 U.S. at 443, 7 S.Ct. at 229. When read together, *Ker* and *Rauscher* establish that when personal jurisdiction over a criminal defendant is obtained through extradition proceedings, the defendant may invoke the provisions of the relevant extradition treaty in order to challenge the court's exercise of personal jurisdiction.

All of the circuit courts of appeals have not embraced the holding we announce today. Other courts have held that an extradited individual lacks standing to assert the doctrine of specialty in the absence of an express objection on the part of the requested nation. Invariably, the courts that adhere to this rule

consider the principle of specialty to be a matter of international law that inures solely to the benefit of the requested nation, protects its dignity and interests, and confers no rights on the accused. *Cf. Shapiro v. Ferrandina,* 478 F.2d 894, 906 (2d Cir.), *cert. dismissed,* 414 U.S. 884, 94 S.Ct. 204, 38 L.Ed.2d 133 (1973). These courts have taken the international law rule of construction that only nations may enforce treaty obligations, and inferred that an individual cannot, therefore, assert any rights under a treaty in our national courts. This analysis is flawed, we submit, because it ignores both the history of the concept of extradition and *Rauscher.*

As we stated earlier, extradition is not a part of customary international law. Therefore, in order to broaden the reach of their criminal justice systems, two nations may enter into a cooperative agreement for the exchange of criminal suspects: an extradition contract. *See Geofroy v. Riggs,* 133 U.S. 258, 271, 10 S.Ct. 295, 298, 33 L.Ed. 642 (1890) (characterizing treaties as contracts between nations). The doctrine of specialty is but one of the provisions of this contract. Of course, the rights conferred under the contract ultimately belong to the contracting parties, the signatory nations. This does not mean, however, that provisions of the contract may not confer certain rights under the contract on a non-party who is the object of the contract. *See generally Rauscher.* We believe that *Rauscher* clearly confers such a right on the extradited defendant. The extradited individual's rights, however, need not be cast in stone; rather, the individual may enjoy these protections only at the sufferance of the requested nation. The individual's rights are derivative of the rights of the requested nation. We believe that *Rauscher* demonstrates that even in the absence of a protest from the requested state, an individual extradited pursuant to a treaty has standing to challenge the court's personal jurisdiction under the rule of specialty. The courts which have adopted the contrary holding, in effect,

consider the requested state's objection to be a condition precedent to the individual's ability to raise the claim. We believe the Supreme Court's recent opinion in *United States v. Alvarez–Machain,* 504 U.S. 655, 112 S.Ct. 2188, 119 L.Ed.2d 441 (1992) seriously undermines any vitality that approach may have once possessed.

A grand jury indicted Humberto Alvarez–Machain, a citizen and resident of Mexico, for participating in the kidnap and murder of United States Drug Enforcement Administration (DEA) special agent Enrique Camarena–Salazar. Following unsuccessful informal negotiations between the United States and Mexico to obtain Alvarez–Machain's presence in this country, DEA successfully contracted with certain individuals for Alvarez–Machain's forcible kidnap and delivery to the United States. Alvarez–Machain contested the district court's personal jurisdiction over him on the grounds that his abduction violated the extradition treaty between the United States and Mexico. The district court granted his request and ordered his return to Mexico. The court of appeals affirmed the district court. The Supreme Court reversed.

The actual holding of the case is that Alvarez–Machain could not contest the court's jurisdiction over him under the extradition treaty because he was not extradited pursuant to treaty proceedings. *See Ker v. Illinois,* 119 U.S. 436, 7 S.Ct. 225, 30 L.Ed. 421 (1886). The Court's analysis, however, rejects the premise underlying the cases that require the requested nation to object as a condition precedent to the individual's ability to claim the benefits of the rule of specialty.

In *Alvarez–Machain,* the Court rejected the Court of Appeals's reasoning that found that the extradition treaty prohibited forcible abduction, but that the abducted individual could only raise the issue if the offended government had formally protested.[4] In re-

---

**4.** *Alvarez–Machain* was an appeal from the decision of a panel of the Ninth Circuit Court of Appeals in *United States v. Verdugo–Urquidez,* 939 F.2d 1341 (9th Cir.1991). Interestingly, the appellate court used that Circuit's rule recognizing an extradited individual's standing to contest jurisdiction under the rule of specialty as a basis

for finding that an abducted defendant could also contest the exercise of personal jurisdiction. Unlike the Ninth Circuit's specialty cases, however, the panel imposed the additional requirement that the offended government object to the abduction in order for the individual to have stand-

jecting the notion of conditionally self-executing treaty provisions, the Court explained that "if the [e]xtradition [t]reaty has the force of law ... it would appear that a court must enforce it on behalf of an individual *regardless of the offensiveness of the practice of one nation to the other nation.*" *Alvarez–Machain*, 504 U.S. at 667, 112 S.Ct. at 2195–96, 119 L.Ed.2d at 454 (emphasis added). Importantly, the Court cited *Rauscher* in support of this proposition:

> In *Rauscher*, the Court noted that Great Britain had taken the position in other cases that the Webster–Ashburton Treaty included the doctrine of specialty, *but no importance was attached to whether or not Great Britain had protested the prosecution of Rauscher for the crime of cruel and unusual punishment as opposed to murder.*

*Alvarez–Machain*, 504 U.S. at 667, 112 S.Ct. at 2195, 119 L.Ed.2d at 454 (emphasis added). *Alvarez–Machain* demonstrates the infirmity in the reasoning of those cases which require an affirmative protest by the requested nation in order for the extradited individual to contest personal jurisdiction under the rule of specialty.

We, therefore, hold that an individual extradited pursuant to an extradition treaty has standing under the doctrine of specialty to raise any objections which the requested nation might have asserted. The extradited individual, however, enjoys this right at the sufferance of the requested nation. As a sovereign, the requested nation may waive its right to object to a treaty violation and thereby deny the defendant standing to object to such an action. *See United States v. Riviere*, 924 F.2d 1289, 1300–01 (3d Cir. 1991); *United States v. Najohn*, 785 F.2d 1420, 1422 (9th Cir.), *cert. denied*, 479 U.S. 1009, 107 S.Ct. 652, 93 L.Ed.2d 707 (1986).[5]

### B. Puentes's Specialty Doctrine Claim

Our review of an order of extraditability presents a legal question concerning the interpretation of a treaty and is, there-fore, subject to plenary review. *Cheng Na–Yuet v. Hueston*, 734 F.Supp. 988, 990 (S.D.Fla.1990). The extradition treaty between the United States and Uruguay provides that an extradited person "shall not be detained, tried or punished in the territory of the requesting Party for an offense other than that for which extradition has been granted...." Treaty on Extradition and Cooperation in Penal Matters, April 6, 1973, United States–Uruguay, art. XIII, P.I.A.S. No. 10850. Puentes makes the unassailable assertion that the prosecutable offense from an extradition proceeding is the offense specified in the warrant of extradition. In its order granting the government's extradition request, the Uruguayan court found as

> valid, the claim of the United States of North America, in respect of the following fact: as from an unknown date, approximately located about 1982, continually, up to November 29, 1988, the required person, together with other persons, associated in order to import cocaine into the territory of the United States, from some place abroad from it.

The order further stated: "It can be taken for evidenced that Puentes had, *at least*, projected and organized the transporting of cocaine on board a freighter vessel in 1985." (Emphasis added.) According to Puentes, the Uruguayan court's reference to the 1985 Orient Star conspiracy limits the government's prosecution to that single instance of cocaine smuggling. To buttress this assertion, he points out that the two affidavits the United States submitted to Uruguay in support of his extradition only referred to the Orient Star conspiracy. We disagree.

Puentes's prosecution under the superseding indictment did not violate the doctrine of specialty. Article X of the extradition treaty provides in relevant part:

> The requested party may require the requesting party to produce evidence to establish probable cause that the person claimed has committed the offense for which extradition is requested. The re-

ing to raise the claim. *Verdugo–Urquidez*, 939 F.2d at 1356–57.

---

5. The requested state's waiver of a treaty provision may occur either contemporaneously with the extradition or after the defendant has been surrendered to the requesting state.

quested Party may refuse the extradition request if an examination of the case in question shows that the warrant is manifestly ill-founded.

Treaty on Extradition and Cooperation in Penal Matters, April 6, 1973, United States–Uruguay, art. X, P.I.A.S. No. 10850. The extradition warrant's reference to the Orient Star conspiracy indicates that, in the Uruguayan court's opinion, the United States had submitted sufficient evidence to establish probable cause to believe that Puentes had committed the offense charged in Count IV of the original indictment. Essentially, Puentes argues that a foreign court may limit the quantum of proof used to secure a conviction in an American court. This court previously rejected that argument when it held that "the doctrine of specialty does not purport to regulate the scope of proof admissible in the judicial forum of the requisitioning state." *United States v. Alvarez–Moreno,* 874 F.2d 1402, 1414 (11th Cir.1989), *cert. denied,* 494 U.S. 1032, 110 S.Ct. 1484, 108 L.Ed.2d 620 (1990). Additionally, we do not believe that the superseding indictment materially altered the substance of the offense for which Puentes has been extradited. Count IV of the superseding indictment merely added additional defendants and extended the conspiratorial period for three years.

### 2. Sentencing

 Whether a defendant should be sentenced under the Sentencing Guidelines is a question of law which we review *de novo.* *United States v. Robinson,* 935 F.2d 201, 203 (11th Cir.1991), *cert. denied,* 502 U.S. 1037, 112 S.Ct. 885, 116 L.Ed.2d 789 (1992). We reject Puentes's claim that he should not have been sentenced under the Sentencing Guidelines that became effective on November 1, 1987. His claim is based on the assertion, which we have just rejected, that the extradition treaty limits his prosecution to the Orient Star cocaine shipment in 1985. Count IV of the indictment listed a conspiratorial period that extended beyond November 1, 1987. Moreover, even if the indictment limited the length of the conspiracy to the date specified in the original indictment, November 29, 1988, the government present-

ed evidence at trial of Puentes's role in the successful importation of 380 kilograms of cocaine into Puerto Rico in May of 1988. In *United States v. Terzado–Madruga,* 897 F.2d 1099, 1123 (11th Cir.1990), this court held that the Sentencing Guidelines governed a conspiracy to possess cocaine which began prior to the effective date of the Sentencing Guidelines and continued past that date.

### 3. Cumulative Evidentiary Error Claims

### A. Admission of Wiretap Transcripts

Puentes challenges the district court's admission of the contents of wiretap conversations between him and coconspirators in 1985. The district court admitted the testimony of Federico Perez, an inspector with the Spanish National Police, who read from a document which contained the Spanish transcription of these taped recordings. Puentes makes the following objections: the evidence should not have been admitted because the prosecution failed to produce the original tape recordings; Inspector Perez lacked personal knowledge of the contents of the transcriptions; the government did not adequately authenticate the transcripts from which the officer testified, in violation of Federal Rules of Evidence 901; and, the district court incorrectly found that Perez adequately established the identity of Puentes as one of the voices on the tape.

The government contends it could not provide Puentes with the original tape recordings because, as Inspector Perez testified, the tapes were erased as a matter of routine procedure after three or four years had passed. The government also contends that because Inspector Perez was one of the two Spanish officers who conducted the wiretap, he was not barred from giving testimonial evidence concerning the contents of recorded conversations which he overheard. Finally, the government also contends that it satisfied rule 901's authentication requirement, and Inspector Perez's lack of familiarity with Puentes's voice prior to commencement of the wiretaps does not undermine the reliability of his identification of Puentes's voice at trial.

We review the district court's evidentiary rulings for an abuse of discretion. *United States v. Smith*, 918 F.2d 1501, 1510 (11th Cir.1990), *cert. denied*, 502 U.S. 890, 112 S.Ct. 253, 116 L.Ed.2d 207 (1991). We are satisfied that the government properly authenticated the contents of the transcripts in compliance with Federal Rules of Evidence 901(a). The inspector testified that he heard every conversation that was contained in the transcripts; that the conversations were then written out in longhand; that the longhand transcription was then compared to the recorded conversation; and, finally, that the longhand transcription was then dictated to a secretary and the typewritten product compared to the longhand transcription. Moreover, the lack of the actual tape recordings does not bar the admission of the transcripts' contents into evidence, when as in this case, an independent ground for their authentication exists. The defense was able to cross-examine Inspector Perez concerning the manner in which the recordings were transcribed. The jury was, therefore, able to draw its own conclusions as to authenticity of the evidence. We also note that Puentes does not contend that the tapes were erased in bad faith. *See James v. Singletary*, 957 F.2d 1562, 1567–68 n. 4 (11th Cir.1992). Finally, rule 901(b)(5) does not require Inspector Perez to have been familiar with Puentes's voice prior to commencing the wiretapping activity. At trial, Inspector Perez testified that he became familiar with Puentes's voice during the two-month wiretap surveillance. This testimony satisfied the requirements of rule 901(b)(5).

### B. *Bruton* claim

The government presented evidence through Inspector Valdomoro of the Spanish Police who testified as to the circumstances surrounding the arrest of Puentes's coconspirator, Indelacio Iglesias. Inspector Valdomoro, in response to a prosecutor's question, apparently stated in Spanish that at Iglesias's arrest he implicated Puentes in the drug conspiracy. Puentes characterizes Valdomoro's statement as an incriminating hearsay statement of a non-testifying codefendant, and argues that he was therefore entitled to a mistrial because five of the jurors were Cuban–Americans who understood what had been said. The government disputes Puentes's interpretation of what Valdomoro said.

A district court's ruling on a motion for a mistrial is reviewed for an abuse of discretion. *United v. Cousins*, 842 F.2d 1245, 1247 (11th Cir.), *cert. denied*, 488 U.S. 853, 109 S.Ct. 139, 102 L.Ed.2d 111 (1988). Our review of the record suggests that Inspector Valdomoro stated in Spanish that at Iglesias's arrest he made statements which caused a Spanish judge to order Puentes's arrest. These remarks, while inappropriate, were not a violation of *Bruton v. United States*, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968). Inspector Valdomoro volunteered his remarks in response to a prosecution question designed to elicit a yes or no response. Additionally, the district court sustained Puentes's objection, and the district court instructed the jury to disregard the remarks. The rule in this circuit is that evidence withdrawn from the jury with a court's direction that it be disregarded may not be the basis of reversible error, unless a significant possibility exists that the words had a substantial impact on the jury's verdict. *United States v. Ruz–Salazar*, 764 F.2d 1433, 1437 (11th Cir.1985). We think it highly unlikely that Inspector Valdomoro's statements had a substantial impact on the jury. The district court did not abuse its discretion in denying Puentes's new trial motion.

### C. Admission of "Good Luck" evidence

Puentes challenges on relevancy grounds the admission of Inspector Valdomoro's testimony concerning his participation in a 1990 conspiracy to smuggle cocaine from Colombia into Spain. The government contends the evidence was inextricably intertwined with the same transactions as the charged offense, or, alternatively, was admissible in order to complete the story of the crime for the jury.

The district court abused its discretion when it allowed the evidence to be admitted. Puentes was charged with conspiracy to import cocaine into the United States. We are unable to see how evidence that

Puentes may have conspired to import cocaine into Spain has any tendency to make any fact that is of consequence to the allegation that he conspired to import cocaine into this country more probable. Fed.R.Evid. 401.[6] Nor do we believe that the Good Luck episode was inextricably intertwined evidence of Puentes's criminal activity in the United States. Nevertheless, in light of the overwhelming evidence of Puentes's participation in an ongoing conspiracy to import cocaine into the United States, we find that the district court's error was harmless.

### 4. *Batson* claim

 Puentes argues that the government peremptorily challenged two African–American jurors whose backgrounds were almost identical to those of unchallenged white jurors, in violation of *Batson v. Kentucky,* 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986). He also contends that the district court approved this action without inquiry. The government contends that Puentes has not made out a prima facie case and that the district court was, therefore, justified in not holding a hearing to determine the basis for the prosecutor's striking of the jurors.

This claim is meritless. Puentes's jury contained four African–Americans. Although the presence of African–American jurors does not dispose of an allegation of race-based peremptory challenges, it is a significant factor tending to prove the paucity of the claim. *See United States v. Allison,* 908 F.2d 1531, 1537 (11th Cir.1990), *cert. denied,* 500 U.S. 904, 111 S.Ct. 1681, 114 L.Ed.2d 77 (1991). The district court did not err in failing to conduct a hearing after Puentes raised the *Batson* claim.

### 5. New trial motion

Puentes argues that newly discovered evidence entitles him to a new trial. He contends that following the completion of his trial, cooperating government witness Gabriel Taboada informed a journalist that he would recant his testimony. Puentes argues that without Taboada's testimony, the gov-

ernment's umbrella conspiracy theory falls apart. The government contends that Taboada, in a December 21, 1992 affidavit, recanted his recantation, thereby reaffirming his prior testimony. The government also contends that the allegedly new evidence would not have produced a different result in a new trial.

A motion for new trial based on newly discovered evidence is committed to the sound discretion of the district court and will not be upset absent an abuse of discretion. *United States v. Espinosa–Hernandez,* 918 F.2d 911, 913 n. 5 (11th Cir.1990). This court has held that a retraction of an earlier recantation of trial testimony does not qualify as newly discovered evidence. *United States v. Santiago,* 837 F.2d 1545, 1550 (1988). Furthermore, the district court found that even if the proffered evidence were credible, it would not result in a change in the verdict. The district court did not abuse its discretion in denying Puentes's new trial motion.

Puentes also argues that the district court committed reversible error when it: allowed the prosecution to cross-examine defense witnesses through the use of guilt assuming hypothetical questions; allowed the admission of hearsay evidence; allowed the prosecution to rehabilitate one of it's witnesses through the use of a hearsay statement of the declarant in violation of Federal Rules of Evidence 801(d)(1)(B); and, allowed the prosecution to impermissibly impeach the credibility of a defense witness. Our review of these claims demonstrates that they are meritless and do not warrant discussion.

### CONCLUSION

Accordingly, we affirm Puentes's conviction and sentence.

**AFFIRMED.**

---

6. The government withdrew its proposed rule 404(b) jury instruction; therefore, the Good Luck evidence was submitted as direct evidence of Puentes's continuing participation in the charged conspiracy. *See* Fed.R.Evid. 402.