[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 12-15126
_____

D.C. Docket No. 9:12-cr-80032-DMM-1


UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

JACK BRUCE FOLK,

Defendant - Appellant.
_____

Appeal from the United States District Court
for the Southern District of Florida
_____

(June 12, 2014)

Before TJOFLAT and WILSON, Circuit Judges, and PROCTOR,[*] District Judge.


TJOFLAT, Circuit Judge:

_____

[*] The Honorable R. David Proctor, United States District Judge for the Northern District of Alabama, sitting by designation.

On July 17, 2012, a jury convicted Jack Bruce Folk, a previously convicted felon, of knowingly possessing a firearm in violation of 18 U.S.C. § 922(g)(1),[1] and pursuant to 18 U.S.C. § 924(e),[2] the District Court sentenced him to a 180 months' imprisonment and three years' supervised release. Folk appeals his conviction, presenting five arguments for the vacation of his conviction and a new trial. None is persuasive, and only three merit discussion here: (1) the District Court erred in denying Folk's motion to suppress two firearms, a 12 gauge semi-automatic shotgun and a .30-.30 caliber lever action rifle, seized during the execution of a search warrant at his residence; (2) the District Court erred in denying Folk's challenge under Batson v. Kentucky, 476 U.S. 79, 106 S. Ct. 1712, 90 L. Ed. 2d 69 (1986), to the prosecution's exercise of a peremptory strike of a

---

[1] 18 U.S.C. § 922(g) provides:

It shall be unlawful for any person—(1) who has been convicted in any court of, a crime punishable by imprisonment for a term exceeding one year . . . to ship or transport in interstate or foreign commerce, or possess in or affecting commerce, any firearm or ammunition; or to receive any firearm or ammunition which has been shipped or transported in interstate or foreign commerce.

[2] 18 U.S.C. § 924(e) provides:

(1) In the case of a person who violates section 922(g) of this title and has three previous convictions by any court referred to in section 922(g)(1) of this title for a violent felony or a serious drug offense, or both, committed on occasions different from one another, such person shall be fined under this title and imprisoned not less than fifteen years, and, notwithstanding any other provision of law, the court shall not suspend the sentence of, or grant a probationary sentence to, such person with respect to the conviction under section 922(g).

2

black veniremember; and (3) the evidence was insufficient to convict.[3]  We

consider these three arguments in turn.

## I.

## A.

The firearms seizure that Folk challenges in this appeal was made by Palm

Beach County Sheriff's Office deputies pursuant to a warrant issued by a Palm

Beach County Circuit Judge.  Folk does not challenge the issuance of the warrant.

Instead, his argument—made first to the District Court and again on appeal—is

that the seizure was not authorized either under the scope of the search warrant or

pursuant to the plain view doctrine and therefore that it violated his Fourth

Amendment rights.[4]  He argues that his motion to suppress the firearms should

have been granted.

---

[3]  The arguments that do not require extended discussion are that (4) the District Court erred in admitting various pieces of evidence during the trial; and (5) the District Court's trial errors considered cumulatively denied Folk a fair trial.  We find no merit in the fourth argument because Folk has not shown that the court abused its discretion in making the challenged evidentiary rulings.  We find no merit in the fifth argument—based on United States v. Munoz, 150 F.3d 401, 418 (5th Cir. 1998) (holding that under the cumulative error doctrine "an aggregation of non-reversible errors (i.e., plain errors failing to necessitate reversal and harmless errors) can yield a denial of the constitutional right to a fair trial, which calls for reversal")—because we find no errors on which to invoke the doctrine.

[4] The Fourth Amendment provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated."  U.S. Const. amend IV.  This provision applies to the States under the Due Process Clause of the Fourteenth Amendment.  Bailey v. United States, __ U.S. __, __, 133 S. Ct. 1031, 1037, 185 L. Ed. 2d 19 (2013).

The District Court denied Folk's motion to suppress following a de novo review of the Report and Recommendation of the Magistrate Judge to whom it referred Folk's motion.  The Magistrate Judge based his recommendation that the motion be denied on the language of the warrant and on the testimony of a deputy in the Palm Beach Sheriff's Office, David Vitola, who applied for the warrant and was present while it was being executed.[5]

Vitola testified that during the early months of 2009, he was operating undercover as an officer in the Sheriff's Office Narcotics Division.  During that time, he made three purchases of Oxycodone—a schedule II narcotic used for the relief of moderate to severe pain—from Nicholas Brandow, a seventeen year old minor.  Nicholas lived with both his mother, Cheryl Brandow, and with Folk at 15544 86th Road, in Loxahatchee, Florida.[6]  Each of the three Oxycodone transactions were made just outside of the 86th Road residence, and on at least one occasion, Nicholas had to first enter the residence to retrieve the drugs.

Vitola knew about Folk before he bought the Oxycodone from Nicholas. Prior to working in the Narcotics Division, Vitola had been assigned to the Tactical

---

[5]  Vitola was the only witness who testified at the evidentiary hearing the Magistrate Judge held on the motion to suppress.

[6] Vitola testified that he had been told by a confidential informant that Folk had a connection to the Brandow residence.  One time when Vitola was there to buy Oxycodone, Nicholas Brandow told him that Folk was in the house.

4

Unit and had helped investigate the "Safe Boys," a local gang of which Folk was a member. Vitola could recognize Folk, and he knew that Folk was a convicted felon.[7]

The search warrant was issued on March 25, 2009, on Vitola's application. The warrant authorized a search of the 86th Road residence and its curtilage in order to uncover and seize

> evidence or proceeds from the illicit possession, sale and/or distribution of Roxicodone and Oxycodone to include:
>
> 1) US Currency, financial instruments, bank statements, bank drafts, cashiers checks, books, notes, ledgers, receipts, and other evidence of financial transactions and related records, relating to the illicit possession, sale and/or distribution of controlled substances.
>
> 2) Books, papers, cell phones, pagers, cameras, video recorders or other electronic media which reflect names, photos, addresses, telephone numbers and/or individuals that may be involved in the illicit possession, sale and/or distribution of controlled substances.
>
> 3) Items used in the packaging or production of narcotics, including but not limited to: scales, baggies, and vials, and other items related to the illicit purchase, possession, sale manufacture and distribution of controlled substances.
>
> 4) Items of identification and papers, documents and affects which establish dominion and control of premises, including, but not limited to, drivers licenses, keys, mail, envelopes, receipts for rent, bills from public utilities, photos, address books and similar items. These items are relevant to the identity of the possessor of the illicit controlled

---

[7] Vitola's knowledge that Folk was a convicted felon came from two sources: (1) his prior experience working in the Tactical Unit; and (2) detectives in the Property Crimes Division.

substances, possessor of other items seized, and occupants of the premises searched.

The warrant was executed on April 1, 2009. Vitola was a member of the search team, but he initially remained outside the residence while the Sherriff's Office SWAT team entered to make a protective sweep. During the sweep, one of the SWAT members, Deputy Jairo Gomez, noticed two firearms located in the master bedroom closet. Gomez did not disturb the firearms, but he did notify Vitola of their location. When Vitola entered the master bedroom looking for drugs, he surmised that it was where Folk and Cheryl Brandow slept. Several photographs of the two were visible around the room, and six empty pill bottles were found: two were prescribed to Cheryl Brandow—both for Oxycodone—and four were prescribed to Jack Folk—one for Oxycodone, one for Xanax,[8] and two for Alprazolam.[9]

In the master bedroom closet, Vitola observed the firearms Gomez had described, a rifle and a shotgun. They were leaning against the right-hand wall with the stocks on the floor and the barrels pointed up. He assumed they belonged to Folk rather than Cheryl Brandow because they appeared to him "to be more hunting, sport-type weapons." Doc. 74, at 30:8. In and of themselves, the firearms

---

[8] Xanax is psychoactive drug used to treat panic and anxiety disorders.

[9] Alprazolam is the generic form of Xanax.

6

did not appear to be illegal, but Vitola knew that Folk was a convicted felon who could not legally possess them.  Vitola seized both firearms.

### B.

On February 16, 2012, a Southern District of Florida grand jury returned the indictment in this case, charging Folk with a violation of 18 U.S.C. § 922(g). Following his arraignment, Folk moved the District Court to suppress the firearms seized from the master bedroom closet during the search of his residence.  Folk conceded the warrant's validity, but he argued that his motion should be granted because the warrant did not specifically authorize the seizure of the firearms, that nothing in Vitola's application for the warrant indicated that firearms were present in the residence, and that there was nothing inherently illegal about the firearms to justify their seizure under the plain view doctrine.

In response, the Government argued that the firearms were tools of the drug trade, and as such, they fell under the warrant's authorization to seize "[i]tems used in the packaging or production of narcotics."  The Government argued, alternatively, that the plain view doctrine authorized the seizure of the firearms because Deputy Gomez had observed them in plain view during the protective sweep, and the incriminating nature of the firearms was readily apparent to Vitola, who knew that Folk was a convicted felon.

7

The Magistrate Judge issued a Report and Recommendation recommending that Folk's motion be denied "based upon the well-recognized connection between firearms and drug-related activity." Doc. 36, at 5. In the Magistrate Judge's view, implicit in the text of the warrant—which authorized the seizure of drug-related items—was an authorization to seize the firearms. Having reached this conclusion, the Magistrate Judge did not consider the Government's alternative argument for denying Folk's motion—the plain view doctrine. The District Court adopted the Magistrate Judge's recommendation in full and denied Folk's motion to suppress.

## C.

In his brief on appeal, Folks relies on the same arguments he presented to the District Court: (1) the firearms were outside the scope of the search warrant; and (2) the plain view doctrine did not justify their seizure.

"Review of a district court's denial of a motion to suppress is a mixed question of law and fact." United States v. Delancy, 502 F.3d 1297, 1304 (11th Cir. 2007). Accordingly, "[w]e review de novo the district court's application of the law to the facts," and "[w]e review factual findings only for clear error, construing all facts in the light most favorable to the prevailing party below." United States v. Bennett, 555 F.3d 962, 964–65 (11th Cir. 2009).

### 1.

8

First, we consider Folk's argument that the firearms fell outside the scope of the warrant. This circuit has routinely recognized that firearms can be so connected to the sale of narcotics that their seizure is implicitly authorized by a warrant to search for narcotics. See, e.g., United States v. Prather, 279 Fed. App'x 761, 766 (11th Cir. 2008) (unpublished) ("When law enforcement officers stumble across hidden guns during a lawful search for drugs, they are allowed to draw the reasonable inference that the guns may be related to drug trafficking occurring at the location."); United States v. Smith, 918 F.2d 1501, 1509 (11th Cir. 1990) ("The firearms were not improperly seized, though not named in the warrant. They are 'tools of the drug trade.'"); United States v. Terzado-Madruga, 897 F.2d 1099, 1120 (11th Cir. 1990) ("It is uniformly recognized that weapons are often as much 'tools of the trade' as the most commonly recognized narcotics paraphernalia."); United States v. Cruz, 805 F.2d 1464, 1474 (11th Cir. 1986) ("Of course, numerous cases have recognized that guns are a tool of the drug trade. There is a frequent and overpowering connection between the use of firearms and narcotics traffic.").

Despite this recognized connection between drugs and firearms, the facts in this case give us pause. Vitola admitted that he had no suspicion that Nicholas Brandow was armed while he engaged in his drug transactions or that he was storing firearms in his residence. When he saw the firearms, Vitola believed they

9

were probably used for hunting rather than as tools of the drug trade.  The small scale of Nicholas Brandow's observed drug transactions further differentiates them from larger operations, where the ownership and use of firearms can be more readily inferred.  See United States v. Perez, 648 F.2d 219, 224 (5th Cir. 1981) ("[E]xperience on the trial and appellate benches has taught that substantial dealers in narcotics keep firearms on their premises as tools of the trade almost to the same extent that they keep scales, glassine bags . . ., cutting equipment, and other narcotic equipment.") (emphasis added) (citation omitted) (internal quotation marks omitted).

Ultimately, we need not address whether the search warrant implied authorization to seize the firearms because we hold that the seizure was valid under the plain view doctrine.[10]

### 2.

Under the plain view doctrine, the warrantless seizure of an item is permissible where "(1) an officer is lawfully located in the place from which the seized object could be plainly viewed and must have a lawful right of access to the object itself; and (2) the incriminating character of the item is immediately

---

[10] Although the District Judge denied Folk's motion to suppress based on a finding that the warrant authorized the seizure of the firearms, "[w]e may affirm the decision of the district court on any ground that finds support in the record."  United States v. Campa, 529 F.3d 980, 998 (11th Cir. 2008)).

10

apparent." United States v. Smith, 459 F.3d 1276, 1290 (11th Cir. 2006) (citing

Horton v. California, 496 U.S. 128, 136–37, 110 S. Ct. 2301, 2308, 110 L. Ed. 2d

112 (1990)); see also United States v. Purcell, 236 F.3d 1274, 1277 (11th Cir.

2001) (explaining that an officer "may seize any contraband, including weapons, in

plain view"). The seizure of Folk's firearms satisfied both of these prongs.

First, the shotgun and the rifle—which were inside the master bedroom

closet—were lawfully observed during the SWAT team's protective sweep and

Vitola's search for narcotics. Folk does not challenge the warrant's validity or tthe

deputies' authority to search the residence for prescription drugs. The SWAT team

and Vitola, therefore, had the right to conduct a search as "extensive as reasonably

required to locate the items described in the warrant." United States v. Jackson,

120 F.3d 1226, 1228 (11th Cir. 1997); United States v. Waugneux, 683 F.2d 1343,

1352 (11th Cir. 1982). They were permitted "to break open locked containers

which may contain the objects of the search." United States v. Martinez, 949 F.2d

1117, 1120 (11th Cir. 1992); see also Jackson, 120 F.3d at 1229 (finding officers to

be lawfully present when "in conducting the search, the officers opened the closet

door and looked inside, finding a firearm instead of [narcotics]"). The master

bedroom closet certainly qualified as a place where Oxycodone pills might

reasonably be found—particularly since empty pill bottles with prescription labels

for Oxycodone, Xanax, and Alprazolam were found in the master bedroom.

11

Since Vitola knew that Folk was a convicted felon and reasonably believed that the firearms belonged to him, the second prong of the plain view doctrine was satisfied. This prong "merely requires that the facts available to the officer would warrant a man of reasonable caution in the belief that certain items may be contraband." Texas v. Brown, 460 U.S. 730, 742, 103 S. Ct. 1535, 1543 , 75 L. Ed. 2d 502 (1983) (citation omitted) (internal quotation marks omitted). A firearm that reasonably appears to be in the possession of a convicted felon qualifies as contraband—and is therefore subject to seizure under the plain view doctrine.[11] See United States v. Williams, 289 F. App'x 868, 871 (6th Cir. 2008) (unpublished) ("The weapon was subject to seizure for the further reason that the officers knew from previous dealings that Williams was a felon."); United States v. Wells, 98 F.3d 808, 810 (4th Cir. 1996) ("Furthermore, the evidence from the prior criminal records review indicating that Wells had a previous felony conviction was sufficient to provide probable cause to believe that the firearm constituted evidence of a § 922(g) offense."). Here, Vitola was justified in reasonably believing that the

---

[11] Many district court decisions in this circuit have explicitly recognized the contraband nature of a firearm in the possession of a convicted felon. See, e.g., United States v. Holt, No. 2:08–cr–38–FtM–29DNF, 2008 WL 5191472, at *5 (M.D. Fla. Dec. 10, 2008), aff'd, 408 F. App'x 229 (11th Cir. 2010) ("The affiant knew defendant was a convicted felon, and had been told by the state that his rights had not been restored. Therefore, defendant's possession of the firearms was unlawful. Since the officers were at a place they were lawfully entitled to be, looked in a place where items identified in the Search Warrant could be found, and the incriminating nature of the firearms was immediately apparent, the firearms could be seized." (citation omitted)).

12

firearms belonged to Folk.  He had been told by both a fellow officer and by Nicholas Brandow himself that Folk resided in the home where the guns were found.  He could recognize Folk's face, and he noticed that there were pictures of Folk in the master bedroom—which was connected to the closet containing the firearms.  Moreover, there were four prescription pill bottles bearing Folk's full name strewn across the master bedroom.  It was therefore reasonable for Vitola to treat the firearms as facially contraband and to seize them under the plain view doctrine.

Because both prongs of the plain view doctrine were satisfied in this case, the District Court did not err in denying Folk's motion to suppress.

## II.

We next address Folk's argument that the government's exercise of a preemptory strike of Juror 21—an African-American[12]—violated Batson v. Kentucky, 476 U.S. 79, 106 S. Ct. 1712, 90 L. Ed. 2d 69 (1986), which recognizes that, under the Equal Protection Clause, a criminal defendant has the "right to be tried by a jury whose members are selected pursuant to nondiscriminatory criteria." Id. at 85–86, 106 S. Ct. at 1717.  Batson and its progeny have established a three-

---

[12] Although Folk is not African-American himself, "a criminal defendant may object to race-based exclusions of jurors effected through peremptory challenges whether or not he defendant and the excluded juror share the same races." Powers v. Ohio, 499 U.S. 400, 402, 111 S. Ct. 1364, 1366, 113 L. Ed. 2d 411 (1991).

step inquiry to evaluate whether a prosecutor's use of peremptory strikes runs afoul of this constitutional right. The Supreme Court summarized this inquiry in Miller-El v. Cockrell, 537 U.S. 322, 123 S. Ct. 1029, 154 L. Ed. 2d 931 (2003):

> First, a defendant must make a prima facie showing that a peremptory challenge has been exercised on the basis of race. Second if that showing has been made, the prosecution must offer a race-neutral basis for striking the juror in question. Third, in light of the parties' submissions, the trial court must determine whether the defendant has shown purposeful discrimination.

Id. at 328–29, 123 S. Ct. at 1035 (citations omitted).

Here, Folk objected to the prosecution's use of a peremptory challenge on Juror number 21, Daniel Thomas. In evaluating whether the prosecution's use of a peremptory challenge against Thomas violated Folk's constitutional rights, we begin by reviewing the relevant facts.

Thomas was one of three black veniremembers, along with Jeffrey Thegg and Tara Hill. Thegg was seated on the jury, and while the prosecution also used a peremptory challenge against Hill, Folk concedes that there were "clear reasons" for doing so.[13]

---

[13] During the questioning of the veniremembers, the prosecution asked whether anyone "believes that people should be allowed to go and have guns to defend themselves regardless of whether they've been convicted of a felony." In response, Hill said that she "fe[lt] like it's okay for him to carry a firearm to defend himself" because she worried about how convicts could protect themselves in situations such as home invasions. When questioned further, she claimed that she could apply the law fairly in rendering a verdict despite her personal beliefs.

14

During the court's voir dire of the veniremembers, Thomas indicated that he had a relative who had been charged with a crime. When the court followed up with further questions, Thomas indicated that his family member had been charged with a similar offense for which Folk was on trial:

> THE COURT: All right. And you said you also had a family member that had been charged with a crime. Was that state or federal court?
>
> THOMAS: It was state.
>
> THE COURT: How long ago?
>
> THOMAS: How long?
>
> THE COURT: Yes.
>
> THOMAS: I'd probably say like two years ago.
>
> THE COURT: Is there anything about what happened to your family member that makes you worry whether you could be fair as a juror?
>
> THOMAS: Well, he was on probation for a firearm.
>
> THE COURT: All right. Well, how do you feel about it? Do you think you can serve as a juror?
>
> THOMAS: Yes.
>
> THE COURT: Or will you be worrying about what happened to your family member?
>
> THOMAS: I can be a juror.

After the court's voir dire, neither the prosecution nor Folk's attorney questioned Thomas directly. Indeed, he was not mentioned again until the prosecution chose to use a peremptory challenge to remove him. In response, Folk raised a Batson

15

challenge, claiming that Thomas was being struck on the basis of race, and the judge asked the prosecution to give its reasons for striking Thomas. In response, the prosecution answered:

> Well, Your Honor, as the Court has already noted, we did not move to strike Geoffrey Thegg, Juror No. 3, who is African American as well, so I don't think that they've established a pattern and practice of striking African American jurors. To the extent that they're complaining about it, I would note that he has—he had a friend who is on multiple years' probation. Apart from the fact, Judge, that I could barely hear the man to begin with, but he indicated that he had a friend on criminal justice sanctions.

The court ruled that it would "accept the reason," without explicitly noting whether Folk had made even made a prima facie showing that the prosecution had exercised a peremptory challenge on the basis of race. Applying these facts to the three-step Batson inquiry articulated above, we find that the trial judge did not err in rejecting Folk's Batson challenge.

First, it is unclear whether Folk made a prima facie showing that Thomas was struck on the basis of his race. Batson held that "a 'pattern' of strikes against black jurors . . . might give rise to an inference of discrimination." 476 U.S. at 97, 106 S. Ct. at 1723 (emphasis added). Also, situations where there is a "total or seriously disproportionate exclusion of [African-Americans] from jury venires" can be so egregious as "to show intentional discrimination." Id. at 93, 106 S. Ct. at 1721 (internal quotation marks omitted).

16

The facts here do not demonstrate a facially discriminatory pattern of striking black members from the potential jury pool.  Thomas was one of only three black veniremembers, and one of these three was ultimately seated on the jury.  The striking of two out of three black veniremembers does not demonstrate a pattern of discrimination—particularly since Folk concedes that there were "clear reasons" for striking Hill from the prospective juror pool.  And this is not a situation where there was a systematic plan to eliminate black jurors from a pool of veniremen.  Compare Adkins v. Warden, 710 F.3d 1241, 1255 (11th Cir. 2013) ("[T]he state here used peremptory strikes to exclude nine of eleven potential black jurors, resulting in a strike rate of eighty-two percent.").

Even if Folk made a prima facie showing of discrimination, however, he has failed to show that the prosecution did not proffer a nondiscriminatory and sincere reason for striking Thomas.  Notably, these are two separate inquiries under Batson's three-part test.  Purkett v. Elem, 514 U.S. 765, 768, 115 S. Ct. 1769, 1771, 131 L. Ed. 2d 834 (1995) ("The Court of Appeals erred by combining Batson's second and third steps into one, requiring that the justification tendered at the second step be not just neutral but also at least minimally persuasive . . . .").

First, we must ask whether the reasons tendered by the prosecution for striking Thomas are nondiscriminatory on their face.  Id. at 767–68, 115 S. Ct. at 1771 ("The second step of [Batson] does not demand an explanation that is

17

persuasive, or even plausible. . . . Unless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race neutral." (internal quotation mark omitted)).  Here, the State gave two reasons for striking Thomas from the jury pool: (1) the prosecutor had trouble hearing Thomas's answers during voir dire; and (2) Thomas had a friend who was on multiple years' probation.  Neither of these reasons inherently implicate Thomas's race, and therefore both reasons satisfy the second step of Batson's three-step inquiry.

The only remaining question is, therefore, whether the stated reasons for making a peremptory challenge were sincere.  The trial judge's decision on this "ultimate question of discriminatory intent . . . represents a finding of fact of the sort accorded great deference on appeal."  Greene v.Upton, 644 F.3d 1145, 1155 (11th Cir. 2011) (internal quotation mark omitted).  We see no reason to second guess the trial judge's evaluation of the prosecution's honesty, particularly given the record's support for the second reason proffered by the prosecution—Thomas did testify during voir dire that he had a friend who was on probation for a crime similar to the one for which Folk was being prosecuted.  Cf. Adkins, 710 F.3d at 1253 (finding the trial judge erred in denying a Batson challenge when the "specific proffered reasons provided by the prosecutor were contradicted by the record").

18

Because Folk has failed to demonstrate that the prosecution acted in a discriminatory manner by striking Thomas from the venire, we hold that the District Court did not err in denying his Batson challenge.

III.

Finally, Folk argues that the evidence at trial was insufficient to support his conviction for knowingly possessing a firearm in violation of 18 U.S.C. § 922(g)(1). In order to prove this offense, the prosecution must establish, beyond a reasonable doubt, that: (1) the defendant had previously been convicted of a felony; (2) the defendant knowingly possessed a firearm; and (3) the firearm traveled in or affected interstate commerce. United States v. Wright, 392 F.3d 1269, 1273 (11th Cir. 2004). Folk concedes that he was a convicted felon at the time of his trial, but he argues that the prosecution failed to demonstrate that he knowingly possessed the firearms or that the firearms were involved in interstate commerce.

In reviewing Folk's argument "we must view the evidence in the light most favorable to the government, and we are required to affirm appellant's conviction unless, under no reasonable construction of the evidence, could the jury have found appellant guilty beyond a reasonable doubt." United States v. Gonzalez, 71 F.3d 819, 834 (11th Cir. 1996) (citations omitted). Here, we find that the evidence

19

supporting both contested elements—knowing possession and movement in interstate commerce—was overwhelming.

### A.

At trial, testimony from the prosecution's witnesses established the narrative of how Folk first took possession of both firearms that were found in his residence. Around 2005, Jack Folk began dating Amber James. The two moved in together, and they had son named Mason. Ms. James's father—Robert James—was an avid deer hunter, and he kept several firearms in a wooden gun cabinet with glass windows in his home. Sometime in 2006 or early 2007, Robert James began to feel uncomfortable having his grandson around this gun case, which he saw as insecure. He decided to replace it with a steel gun safe and to give the wooden gun cabinet to Folk. Among Robert James's many guns was the .30-.30 lever action rifle at issue in this case. The lever on the rifle was broken, and James decided to give this rifle to Folk along with the wooden gun case.

In June 2007, Folk first met Cheryl Brandow while he was still living with Amber James. The two hit it off, and Folk moved in with Brandow in July. While the two were living together, Brandow decided to give Folk—as a birthday

20

present—gift cards amounting to around $200.[14]  On October 21, 2007, Folk and Brandow took these gift cards to a Bass Pro Shop.[15]  There, Brandow purchased a 12 gauge semi-automatic shotgun, using the gift certificates that she had given Folk as a birthday present.  Brandow bought the shotgun under her name because Folk was already a convicted felon and could not personally purchase them.  Pursuant to Florida's waiting period for firearm purchases, Brandow was unable to take physical possession of the shotgun until November 1, 2007.  On that date, Folk again accompanied Brandow to the Bass Pro Shop where she retrieved the firearm.  Once the two returned home, Brandow gave the shotgun to Folk who thanked her for it.  Folk routinely took this shotgun on hunting trips with friends, and although the shotgun remained registered under Brandow's name, she never fired it or accompanied Folk when he used it for hunting.

At some point prior to 2009, Folk brought both the rifle that he had received from Robert James and the shotgun he had received from Brandow to the home of

---

[14] Ms. Brandow and Folk had a brief falling out in 2007, and Folk temporarily moved back in with Amber James.  During this time, the gift cards remained in the possession of Brandow, and she returned them to Folk once the two reunited and were again living together.

[15] The Bass Pro Shop was located slightly south of Fort Lauderdale, about an hour and fifteen minutes from Brandow and Folk's residence.

his uncle—Mark Farley—for safe keeping.[16]  On March 23, 2009, Folk was apprehended by Palm Beach deputies on a crime unrelated to his possession of these two firearms.

While he was in jail, Folk's phone conversations were recorded, and after the firearms were seized from his residence, these conversations were reviewed by police officers.[17]  During the trial, the prosecution introduced recordings of these phone calls to demonstrate that—even from jail—Folk continued to assert ownership over both the rifle and the shotgun.  First, when Folk learned that Cheryl and Nicholas Brandow were having financial difficulties, he instructed them to sell these firearms in order to free up some cash.  On March 25, 2009, during a conversation with Cheryl Brandow, Folk asked to speak with his friend John—who was in the room with Brandow—to "see if he can sell all my tools and my guns" so that Cheryl and Nicholas "can get a little money or something so." When Cheryl Brandow put John on the phone, Folk told him, "I've got, I've got

---

[16] At sentencing there was evidence introduced that Folk had actually brought a third firearm to Farley as well—a .22 rifle—but this gun was never mentioned during trial and Folk was never charged for its possession.

[17] Although the police never obtained a warrant to record or monitor these calls, they did not violate Folk's Fourth Amendment rights.  During the earliest conversation introduced at trial, Cheryl Brandow told Folk that "[the police] have been listening on our phone."  In response, Folk simply said "Yeah."  Clearly, Folk had "neither a subjective, or objectively reasonable, expectation of privacy with regard to his calls from the jailhouse."  See United States v. Garrett, 388 Fed. App'x 888, 891 (11th Cir. 2010).

22

um them two guns.  I've got a .30-.30, and I got my shotgun.  See if [my friend] Bo wants to buy those."   The following day, March 26, Folk again told Brandow, "[W]hatever you can see just sell it like, um tell Bo that I got a .30-.30 with a scope, and I got my shotgun that he can get for like four or five hundred bucks.  I'll get, I'll get it back from him when I get out."  Later that day, he told Nicholas Brandow, "If your mom don't remember, I got a .30-.30 with a . . . scope and I got a shotgun, I want 500 bucks for 'em both."

Folk's jail conversations also demonstrated that he could still command his uncle Mark Farley—who had actual possession of the guns—to disgorge the weapons.  For example, on March 29, Cheryl Brandow told Folk that when she had sent one of Folk's friends to pick "the um, things from [Farley],"[18] he had resisted saying that Folk never told him to turn them over.  In response, Folk assured Brandow saying, "I mean I can call him to release them to you if you want, that's not a problem.  I'll call him."  Only fifteen minutes later, Folk spoke with Farley and told him, "Just, can you do this, can you do this for me right now, bro?  Please can you go over there and give her the shotgun and the .30–30."  Farley agreed

---

[18] At the trial, Cheryl Brandow admitted that she was referring to the rifle and the shotgun when she said "things."  She and Folk had begun speaking in code based on their fear of having their conversations monitored.  The rest of the conversation corroborated this testimony as Cheryl Brandow said that "one is a birthday gift from me to you" which almost certainly referred to the shotgun she had purchased for him at the Bass Pro Shop.

saying, "Hell yeah.  I'll take it over there right now."  That same day, Farley did in fact deliver both the rifle and the shotgun to Cheryl Brandow.

This evidence is sufficient to show that Folk knowingly possessed both the rifle and the shotgun found at his residence.  Although he was currently incarcerated at the time that the warrant was executed, "any firearm possession, actual or constructive, by a convicted felon is prohibited by law."  United States v. Howell, 425 F.3d 971, 977 (11th Cir. 2005).  "To establish constructive possession, the government must prove 'ownership, dominion, or control' over the firearm."  United States v. Molina, 443 F.3d 824, 829 (11th Cir. 2006) (quoting United States v. Ferg, 504 F.2d 914, 916 (5th Cir. 1974)).  Here, a reasonable jury could find that Folk knowingly had constructive possession of both the shotgun and the rifle.  Both were given to Folk personally, and he continued to control their movements until they were seized from his residence on April 1, 2009.

### B.

The evidence presented at trial was also sufficient to demonstrate that the firearms moved in interstate commerce.  A detective with the Palm Beach County Sheriff's Office, Steven Barborini, testified on this issue.  Before Folk's trial, he had testified well over a hundred times in federal and state court regarding the manufacture of firearms and their relationship to interstate commerce.  Without objection by Folk, the court declared Barborini an expert in the interstate

24

commerce movements of firearms and ammunition.  Barborini thereafter testified that the markings and serial numbers imprinted on the firearms—as required by federal law—indicated where they were manufactured.  Based on these markings and numbers, Barborini said that the shotgun was manufactured in Turkey—imported via Nevada—and that the lever action rifle was manufactured in Connecticut.

A reasonable jury could rely on Barborini's testimony in concluding that the firearms had moved in interstate commerce.  The interstate nexus element of 18 U.S.C. § 922(g) can be established by showing that the firearm was manufactured in a different state from the one in which it was ultimately possessed by the defendant.  United States v. Clay, 355 F.3d 1281, 1287 (11th Cir. 2004) ("We have stated that a weapon which was seized in Florida and 'bore an imprint indicating that it had been manufactured in Atlanta' gave a 'clear indication of interstate commerce.'" (quoting United States v. Brantley, 68 F.3d 1283, 1288 (11th Cir. 1995))).  Such a showing can come from the testimony of an expert witness.  See United States v. Scott, 263 F.3d 1270, 1274 (11th Cir. 2001).  Here, Barborini's testimony was sufficient for the jury to conclude, beyond a reasonable doubt, that both the shotgun and the rifle had traveled in interstate commerce.

25

IV.

The District Court did not err in denying either Folk's motion to suppress the firearms seized from his residence or his <u>Batson</u> challenge to the prosecution's peremptory strike of veniremember Thomas.  And the evidence presented to the jury was sufficient to support Folk's conviction under 18 U.S.C. § 922(g).  Folk's remaining allegations of error are without merit.  The judgment of the District Court is, accordingly,

AFFIRMED.