[DO NOT PUBLISH]

# In the
# United States Court of Appeals
## For the Eleventh Circuit

_____

No. 23-11386

Non-Argument Calendar

_____

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

*versus*

JUAN RANGEL-RUBIO,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Southern District of Georgia
D.C. Docket No. 4:18-cr-00274-LGW-BWC-2

_____

Before ROSENBAUM, JILL PRYOR, and BRANCH, Circuit Judges.

PER CURIAM:

Appellant Juan Rangel-Rubio ("Rangel-Rubio") was charged and convicted of conspiring to conceal, harbor, and shield undocumented persons, in violation of 18 U.S.C. § 1324(a)(1)(A)(v)(I); conspiring to commit money laundering, in violation of 18 U.S.C. § 1956(h); conspiring to kill a witness, in violation of 18 U.S.C. § 1512(k); and conspiring to retaliate against a witness for providing testimony or documents in an official proceeding conducted by the Equal Employment Opportunity Commission ("EEOC"), in violation of 18 U.S.C. § 1513(f). Rangel-Rubio appeals those convictions and seeks a new trial, arguing that the district court improperly overruled his *Batson*[1] challenge regarding a particular juror. After careful consideration, we affirm.

## I.

A summary of the facts as alleged in the indictment is helpful. Rangel-Rubio and his brother Pablo Rangel-Rubio ("Pablo") worked for the Davey Tree Expert Company. Pablo helped undocumented individuals gain employment there by providing them with assumed identities. Pablo paid the undocumented persons in cash, but with the help of Rangel-Rubio, he diverted the paychecks to Rangel-Rubio's bank account for their own financial gain. Eventually, Eliud Montoya, who worked for a subsidiary of the

---

[1] *Batson v. Kentucky*, 476 U.S. 79 (1986).

Davey Tree Expert Company, reported the scheme to the EEOC. Later, Rangel-Rubio and Pablo conspired to kill Montoya for reporting them, and Pablo paid someone to help Rangel-Rubio murder Montoya. On August 19, 2017, Montoya was shot near his home in Georgia. Rangel-Rubio was charged with the four counts set forth above, and the case proceeded to trial.

During voir dire, each of the potential jurors answered prepared questions. The juror at issue here, Juror 31,[2] is a Black female, who said she was single, had a young daughter, was self-employed as a hair stylist, had never served in the military, had never served on a jury before, and had obtained an associate's degree. At the conclusion of voir dire, the parties exercised their peremptory strikes, with the government using only five of its six strikes, including one to strike Juror 31.

When the district court asked if there was any reason to believe that the jury was not fairly and impartially impaneled, the government responded in the negative, but Rangel-Rubio raised a *Batson* challenge. During a sidebar on the *Batson* challenge, Rangel-Rubio argued that the government used all but one of its peremptory strikes to strike potential jurors who were either Black or Hispanic. And counsel argued that the seated jury had only two Black individuals, even though the jury pool was more diverse. When the district court asked Rangel-Rubio to establish a prima facie case under *Batson*, counsel pointed out that the government struck one

---

[2] At trial Rangel-Rubio raised concerns over the fact that various potential jurors were struck. But in this appeal, only Juror 31 is at issue.

Black man, one Hispanic man, three Black women, and one white woman. Juror 31 was one of the Black women the government struck. But counsel agreed that each side gave up a strike voluntarily.

The district court concluded that Rangel-Rubio produced sufficient evidence to draw the conclusion that an inference of discrimination occurred. So it asked the government to provide non-discriminatory reasons for the strikes. The government went through the jurors and provided a reason for each particular strike. As for Juror 31, the government said that she did not have stable employment and did not have strong ties to the community, and other jurors had longer and stronger ties to the community. The government also noted that during the second phase of the selection process, it observed Juror 31 (who was sitting "right behind" counsel), and it appeared she was not paying attention. In the government's view, that raised concerns about her ability to remain engaged and focused during the proceedings. Finally, the government voiced concern over what it thought was an inconsistency in Juror 31's responses: in the written summary she answered before voir dire, Juror 31 claimed to be unemployed, but when questioned during void dire, she said she was self-employed as a hair stylist.

Following this explanation, the district court determined that the government provided legitimate, non-discriminatory reasons to support the peremptory strikes. It concluded, based on counsel's demeanor and its observation of the potential jurors' demeanor, the proffered reasons were sufficiently race- and gender-

neutral for all five peremptory strikes, including the one used on Juror 31. With respect to Juror 31 specifically, the district court voiced its own observation that she "was not paying attention for a good bit of the jury selection." In sum, the jurors' demeanor along with counsel's demeanor led the district court to conclude that the *Batson* challenge should be overruled.

The trial proceeded, and the jury found Rangel-Rubio guilty of all counts. Rangel-Rubio moved for a new trial based on the alleged *Batson* violation. In that filing, he argued, among other things, that the race-neutral reasons that the government provided were not sufficient because the government failed to strike potential white jurors with the same attributes. The district court denied the motion for new trial, rejecting Rangel-Rubio's argument that the government did not strike similarly situated white potential jurors. The court also noted that the government had a strike remaining and opined that the government could have used that strike to remove one of the two seated Black jurors if removing minorities had been its goal. Based on its own observations and the government's proffered reasons, the district court concluded Rangel-Rubio failed to show purposeful discrimination in the jury-selection process.

Rangel-Rubio now appeals the district court's ruling on his *Batson* challenge, claiming he is entitled to a new trial.

## II.

When a defendant alleges a *Batson* violation, we review jury selection de novo but review the district court's underlying factual

findings for clear error. *United States v. Campa*, 529 F.3d 980, 992 (11th Cir. 2008). A district court's ruling on the issue of discriminatory intent involves credibility determinations, so we must sustain it unless it is clearly erroneous. *United States v. Gamory*, 635 F.3d 480, 495-96 (11th Cir. 2011).

## III.

Under the Equal Protection Clause, a criminal defendant is entitled to "be tried by a jury whose members are selected pursuant to nondiscriminatory criteria." *Batson*, 476 U.S. at 85-86. Accordingly, the purposeful and deliberate denial of a member of a minority group to participate as a juror in the administration of justice, on account of race, violates the Equal Protection Clause. *Id.* at 84. A defendant may challenge the government's exercise of peremptory challenges when it believes they reveal a pattern of purposeful racial discrimination in the selection of the jury. *Id.* at 94-97.

*Batson* and its progeny established a three-step framework for evaluating race-discrimination claims in jury selection. The Supreme Court summarized this test in *Miller-El v. Cockrell*, 537 U.S. 322 (2003), as follows:

> First, a defendant must make a prima facie showing that a peremptory challenge has been exercised on the basis of race. Second, if that showing has been made, the prosecution must offer a race-neutral basis for striking the juror in question. Third, in light of the parties' submissions, the trial court must determine

whether the defendant has shown purposeful discrimination.

*Id.* at 328-29 (internal citations omitted).

Here, the district court found that the defendant satisfied step one—Rangel-Rubio made a prima facie showing that the government struck Juror 31 on the basis of race. Neither party challenges this finding. Because Rangel-Rubio made a prima facie showing, the burden shifted to the government to articulate a race-neutral reason for the strike.

At step two, we ask whether the reasons the government tendered for striking a juror are nondiscriminatory on their face. *United States v. Folk*, 754 F.3d 905, 914 (11th Cir. 2014). *Batson*'s second step does not demand an explanation that is persuasive. *Id.* Unless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race-neutral. *Id.* (citing *Purkett v. Elem*, 514 U.S. 765, 767-68 (1995)). In the district court, among other things, the government pointed to Juror 31's inattentiveness as one of the reasons for its use of a peremptory strike. We have held that inattentiveness is a valid race-neutral reason for using a peremptory strike. *United States v. Cordoba-Mosquera*, 212 F.3d 1194, 1197 (11th Cir. 2000) (per curiam). So here, the government satisfied step two.

At step three, the burden then shifts to the defendant to prove purposeful discrimination. *United States v. Tokars*, 95 F.3d 1520, 1533 (11th Cir. 1996). The district court must evaluate the persuasiveness of the government's proffered reason and

determine whether, considering all relevant circumstances, the defendant has carried his burden of proving purposeful discrimination. *United States v. Ochoa-Vasquez*, 428 F.3d 1015, 1039 (11th Cir. 2005). The defendant may show evidence of purposeful discrimination through side-by-side comparisons confirming that the reasons for striking a Black panelist also apply to similar non-Black panelists who were permitted to serve. *See United States v. Houston*, 456 F.3d 1328, 1338 (11th Cir. 2006). If the government's reason for striking Black venire members applies equally to white venire members who were not struck, that provides evidence supporting purposeful discrimination at *Batson*'s third step. *Id.* But the failure to strike similarly situated jurors is not pretextual when relevant differences exist between the struck and comparator jurors. *United States v. Novaton*, 271 F.3d 968, 1004 (11th Cir. 2001).

The critical question at this final stage is whether the trial court finds the proffered race-neutral explanations credible. *Miller-E*, 537 U.S. at 338-39. "Credibility can be measured by, among other factors, the prosecutor's demeanor; by how reasonable, or how improbable, the explanations are; and by whether the proffered rationale has some basis in accepted trial strategy." *Id.* at 339. The best evidence of discriminatory intent typically will be the demeanor of the attorney who exercises the challenge. *Snyder v. Louisiana*, 552 U.S. 472, 477 (2008).

In cases when race-neutral reasons for peremptory challenges invoke a juror's demeanor, though—such as the individual's nervousness or inattentiveness—the district court "must evaluate

not only whether the prosecutor's demeanor belies a discriminatory intent, but also whether the juror's demeanor can credibly be said to have exhibited the basis for the strike attributed to the juror by the prosecutor." *Id.* These determinations of credibility and demeanor lie within a district court's province. *Id.* In fact, the district court's decision on this "ultimate question of discriminatory intent" is a finding of fact that we "accord[] great deference on appeal." *Folk*, 754 F.3d at 914 (citation and internal quotation marks omitted). Finally, although the presence of a Black juror on the jury does not dispose of the allegation of a race-based peremptory challenge, under our precedent, it is a factor that tends to moderate against a finding of discriminatory intent. *United States v. Puentes*, 50 F.3d 1567, 1578 (11th Cir. 1995).

We conclude that the district court did not clearly err when it accepted the government's reasons for striking Juror 31 as nondiscriminatory. First, Rangel-Rubio does not challenge the district court's finding about the government's demeanor in exercising its strikes. That unchallenged finding weighs in favor of affirming the district court's decision to overrule the *Batson* challenge. Second, contrary to Rangel-Rubio's assertion, the record was sufficiently developed to support a finding that Juror 31 was inattentive, and that is enough on its own to affirm the district court's ruling.

In *United States v. Diaz*, we noted that a potential juror's inability to pay attention is race-neutral reason for a peremptory strike. 26 F.3d 1533, 1544 (11th Cir. 1994). Still, we recognized that when explanations are based on the juror's demeanor, a greater

chance of abuse exists. So we explained that, in such a case, the district court must develop the record to allow for meaningful appellate review. *Id.* at 2543. We said that to do so, the district court should confirm that the stricken juror's demeanor was different than that of other potential jurors. *Id.* In *Diaz*, like here, the government's proffered reason for using a peremptory strike was the inattentiveness of the juror. *Id.* This Court concluded that the district court did not clearly err in finding that the prosecutor offered a race-neutral reason for the strike because the record reflected that the juror directed her attention to the defendants rather than the prosecution during jury selection. *Id.* This behavior allowed us to infer that the juror's behavior was different than other venirepersons. *Id.*

Likewise, in *Cordoba-Mosquera*, a district court determined that a peremptory strike was not intentionally discriminatory when the potential juror's demeanor was the reason for the strike. 212 F.3d at 1197-98. The prosecution pointed to the fact that the juror shrugged his shoulders and did not answer audibly as a race-neutral reason for the strike. *Id.* We determined that the proffered reason was clear and reasonably specific because the government explained that the juror's body language and mannerisms indicated that he did not want to be a juror. *Id.* We inferred that the juror was "more inattentive" than other seated jurors. *Id.* at 1198. And we deferred to the district court where it made an "on-the-spot interpretation" of the juror's behavior. *Id.*

Here, the government asserted that Juror 31 was inattentive during jury selection and that it had personally observed her since she was sitting "right behind" counsel.  The district court also expressly noted its own observation that Juror 31 "was not paying attention for a good bit of the jury selection."  Although Rangel-Rubio asserts otherwise, the statements by the government and the district court are sufficiently specific to allow for appellate review. *See Diaz*, 26 F.3d at 1543 and *Cordoba-Mosquera*, 212 F.3d at 1198. And as in *Diaz* and *Cordoba-Mosquera*, the statements that both the government and district court made are sufficient to allow us to infer that Juror 31 was more inattentive than other seated jurors. Significantly, when given the opportunity to rebut the reason related to inattentiveness, Rangel-Rubio failed to do so.  He did not identify any other potential jurors who were inattentive, other than those who were struck.  Accordingly, the district court did not clearly err in finding that Juror 31 was inattentive, and her inattentiveness alone was a race-neutral reason to support striking her.

But even if we consider Rangel-Rubio's argument that seated white jurors were similarly situated to Juror 31, that argument fails because he did not identify a seated juror who had the same characteristics as Juror 31.[3]  The government stated that Juror 31 was struck because she was single, did not have stable employment, did not have strong ties to the community, was inattentive, and had inconsistent answers with respect to her employment

---

[3] We assume without deciding that Rangel-Rubio adequately raised this issue with the district court in his motion for new trial.

status. Of the twelve seated jurors, none had all the characteristics that Juror 31 had and about which the government complained, and only five had more than one shared characteristic. The only potential juror who was single and unemployed (or underemployed), who had discrepancies between her questionnaire and answers in court, who had minimal ties to the community, and who was inattentive was Juror 31. Most importantly, all other potential jurors identified as inattentive were struck.

Given that none of the seated jurors had all the characteristics of Juror 31 (or even a majority of the characteristics), the seated jurors were not similarly situated to Juror 31. *See Novaton*, 271 F.3d at 1004. Rangel-Rubio therefore failed to show that the district court clearly erred in accepting the government's proffered reasons for striking Juror 31.

Finally, under our precedent, we must consider the fact that the government did not attempt to exclude as many Black individuals as it could have from the jury. As the record reflects, the government chose not to use one of its peremptory challenges and the jury as seated included two Black jurors. Although the presence of Black individuals on the jury is not dispositive, that fact under our precedent supports the district court's determination that no *Batson* violation occurred. *See Campa*, 529 F.3d at 998 and *Gamory*, 635 F.3d at 496 (citing *Puentes*, 50 F.3d at 1578) ("Although the presence of African–American jurors does not dispose of an allegation of race-based peremptory challenges, it is a significant factor tending to prove the paucity of the claim.")).

## IV.

For the foregoing reasons, we conclude that the district court did not err in overruling Rangel-Rubio's *Batson* challenge.

**AFFIRMED.**